Joe Dan Market, Inc., Respondent, v. Louis H. Wentz, William Geddell, Charles Leonhard, or Leonard, and Amalgamated Meat Cutters and Butchers Workmen of North America, Local No. 88, an Unincorporated Association, Appellants.*— 20 S. W. (2d) 567.

St. Louis Court of Appeals. Opinion filed October 8, 1929.

*Corpus Juris-Cyc References: Injunctions, 32 CJ, section 50, p. 67, n. 18; section 262, p. 179, n. 54; section 265, p. 182, n. 76; section 581, p. 350, n. 76; section 645; p. 378, n. 3.

*Anderson & Whittington,* for appellants.

*Albert E. Hausman* for respondent.

SUTTON, C.—This is an injunction suit brought by plaintiff to enjoin the picketing by defendants of his place of business, which is a retail grocery store and butcher shop, called the Joe Dan Market, located at 4113 Easton Avenue, in the city of St. Louis. Upon the filing of the petition, an order to show cause issued. On July 31, 1924, upon proper hearing, a temporary restraining order issued. On June 1, 1925, upon final hearing, judgment was given perpetually enjoining the picketing, and from this judgment defendants appealed to the Supreme Court, but that court finding itself without jurisdiction of the cause transferred it to this court. The opinion transferring the cause is reported in 13 Southwestern (2d) 641.

The defendants contend here that the evidence shows a peaceful picketing of the plaintiff's premises in support of a valid grievance which the defendant union claimed to have against Daniel Kohn as owner and operator of the Joe Dan Market, and urge that this court, exercising its prerogative as a court of equity, should review the evidence, and reverse the judgment.

Prior to the events involved in this suit, Daniel Kohn had been a resident of the city of St. Louis for about twenty-five years, and for a year or two had operated a butcher shop and grocery store at 4113 Easton Avenue, using the trade name "Joe Dan Market." On June 3, 1924, he incorporated his business, the incorporators being Daniel Kohn, his wife, and Arthur O'Donnell. Kohn had been aquainted with defendants Geddell, Leonard, and Wentz for some time, and knew Leonard as the business agent of defendant Amalgamated Meat Cutters and Butchers Workmen of North America, Local Union No. 88, and knew the defendant Wentz as secretary and treasurer of the union, and made the acquaintance of defendant Geddell as chief in charge of the men and women who were picketing his place of business. Arthur O'Donnell was a meat cutter, who had been in the employ of Kohn from January, 1924, at a wage of $45 per week. The union scale of wages was $37.50 per week. O'Donnell was not a member of the union. When the Joe Dan Market was incorporated, on June 3, 1924, Arthur O'Donnell, who became one of the incorporators, remained as an employee and meat cutter at the same salary, to-wit, $45 per week. On May 22, 1924, suddenly and without any previous warning to come, Leonard, Geddell, and Wentz, accompanied by other men whose names were unknown to Kohn, appeared on the sidewalk in front of plaintiff's place of business and began to pass to and fro on the same, one of the men carrying an umbrella with a sign painted thereon, as follows: "Do not patronize Joe Dan Market, unfair to union labor," and began to pass handbills to all pedestrians. The building in which plaintiff's shop was conducted, and in front of which the picketing was done, has a front of twenty or twenty-one feet on Easton Avenue, and the sidewalk is about nine or ten feet wide. There is only one entrance to the front of the building, which has a screen door, opening out, situated midway between the east and the west wall of the building. The pickets at times would walk to and fro in front of the premises so close to the screened door as to interfere with the opening of the door by persons who desired to go into the store or to leave the store. The number of pickets varied from two to twelve. women also appeared in front of the place, and called out in a loud voice to those who attempted to enter the store that they would bow their heads in shame rather than enter that place to patronize a place that was unfair to organized labor. This picketing was con-

tinuous from nine o'clock in the morning until the place was closed in the evening. The actions and the tones of voices at which the pickets carried on their activities in front of the building attracted at times such a number of people that the sidewalk in front of the store was blocked. Finally Kohn requested the police department to keep his sidewalk open in front of his place of business. A great many persons who patronized the store would not enter same, but would walk away, and go across the street and patronize other stores. The pickets would also follow, or accompany, persons who had been in the store making purchases. Sometimes they followed them three or four blocks from the store to their place of residence. Defendant Geddell, one of the pickets, assaulted and struck Kohn in front of his store with an umbrella. On that occasion Geddell stopped a man and a woman who had been in the store and bought some groceries. In order to stop them, he stepped into the doorway of the store and Kohn told him that he did not want him to stop any one in the doorway. Whereupon Geddell requested Kohn to step out of the door. Kohn did this, and Geddell closed the umbrella he was carrying, called Kohn a vile name, and struck him with the umbrella, and then assaulted him with his fists. On another occasion subsequent to that, a man by the name of Clark, who had recently been talking with Geddell in front of the store, came up and spoke to Kohn and made a vile remark to him and told him that he should agree to the union's terms, and then walked away. He soon afterwards came back. Kohn told him that he was getting along all right, managing his own business. Thereupon, Clark struck him in his face with his fist. On other occasions the pickets attacked and threatened attacks upon Kohn. Prior to the time that Kohn had hired Arthur O'Donnell as a meat cutter, he had men in his employ who were members of local union No. 88, and those men had quit his employ. He thereupon requested the officers of the local union to send him a meat cutter; and the local union either could not or would not send a meat cutter, and after five days Kohn employed O'Donnell at a salary of $45 per week. On one occasion one of the pickets, while in an intoxicated condition, followed a woman, who had been in the store and made purchases, several blocks. The pickets were frequently intoxicated. After the picketing had been going on for some time, defendant Geddell came to Kohn and told him that Leonard would call upon him with reference to settling the matter. Soon afterwards Leonard called and advised Kohn that he desired a conference with a view to settling the matter, but advised him that before he would discuss the matter of settlement with him he must first pay the pickets $9 per day for picketing his place. Kohn refused to do this, and the picketing continued until it was stopped by the temporary injunction issued herein. Kohn customarily opened his store at

5:30 in the morning, and the butchers who worked for him began work at six o'clock. This was true of the butchers whom the union supplied. On one occasion an old man coming out of the store was accosted by defendant Geddell, captain of the pickets, who asked him what in the hell he was doing in there, and called him a damned scab. At times pickets would step into the doorway, and accost those who were leaving the store. Persons who stopped their automobiles in front of the store were told that they had better move on or the machine would be torn up. A woman who had refused to take a handbill from the picket was cursed and told to go hell. The calling of the pickets and the woman accompanying them was so loud that it could be heard across the street, a distance of about eighty feet. Neither Kohn nor the Joe Dan Market had ever had a contract with local union No. 88. A keeper of a restaurant adjacent to plaintiff's store had been in the habit of supplying meals to an employee in the store. Geddell observed this, and advised him that if he took any more meals in there he might lose some union business. Thereupon the supplying of meals ceased.

The contract which the union requires employers of meat cutters who are members of the union to sign, provides that working hours shall be from seven A. M. to six P. M., with the exception of Saturday, when nine P. M. shall be the limit of time of work; and provides further that all meat cutters must be hired through the union; that the employer may employ any one if the union cannot supply men, but that such men must be sent to the office of the union before going to work, to secure a permit card; that if a person working with such permit card does not join the union within six days he shall upon request be discharged; that no man is allowed to go to work who is not in possession of such a permit card; that when in need of extra men only union men shall be employed. Neither Kohn nor the plaintiff, however, ever signed or entered into this or any other contract with the union. The grievance which the defendants claimed to have against Kohn and the plaintiff is that he opened his shop earlier in the forenoon and closed it latter in the evening than as provided for in this contract. It appears, also, that they resented the employment of O'Donnell, who was not a member of the union, contrary to the provisions of said contract.

The handbills distributed by the pickets in front of plaintiff's place of business were captioned, in large capital letters, "Unfair!" and requested the people to show the proprietor that his judgment of union men and women and sympathizers is wrong, and that the best thing for him to do is to be fair to the meat cutters of local union No. 88.

It appears to be settled that the picketing of an employer, peacefully conducted, is not unlawful. [Hughes v. Motion Picture Machine

Operators, 282 Mo. 304, 221 S. W. 95; Hamilton-Brown Shoe Co. v. Saxey, 131 Mo. 212, 32 S. W. 1106; F. C. Church Shoe Co. v. Turner (Mo. App.), 279 S. W. 232.] In the instant case, however, there was abundant evidence to support a finding by the chancellor that the picketing was not peacefully conducted, but was accompanied, by intimidation, threats, violence and coercion, so that it may properly be held to establish a nuisance. Against picketing so conducted injunction lies.

But defendants insist that the judgment given by the chancellor is too broad, in that it restrains defendants from walking on the sidewalk in front of plaintiff's place of business or premises, or adjacent thereto, in such manner as to interfere with the ingress to or egress from said premises by plaintiff's customers and from calling out to plaintiff's customers entering or about to enter or leaving plaintiff's said place of business that plaintiff is unfair to union labor, and from carrying umbrellas with signs painted thereon, or other signs, or distributing handbills in front of plaintiff's said place of business and said adjoining or adjacent premises, warning or requesting the public not to patronize plaintiff because plaintiff is unfair to union labor, and thus restrains the defendants from conducting a peaceful and lawful picketing of plaintiff's place of business; in other words, that the decree restrains the picketing of plaintiff's premises, though the picketing be conducted without intimidation, threats, violence or coercion. This insistence is untenable. The picketing conducted by defendants consisted of one continuous transaction, involving unlawful acts on the part of defendants, and showing, by a systematic course of conduct and concerted action, their intention to accomplish their purpose by unlawful means. In such case equity will do complete justice by enjoining the whole of the unlawful proceeding. Picketing conducted as this was, accompanied by intimidation, threats, violence and coercion, soon becomes current in the neighborhood, so that a continuation of the picketing, even though conducted peaceably, would probably, if not necessarily, result in intimidation.

Defendants further insist, in their reply brief, that the decree is erroneous in enjoining defendants from interfering with plaintiff's customers desiring to supply plaintiff or its employees with any goods, merchandise or supplies, on the ground that there is no evidence that any person desiring to furnish supplies was coerced or intimidated, and that in this the injunction restrains defendants from committing acts which they have not threatened or in their conduct indicated the slightest intention of attempting. The evidence shows that the defendants did interfere with the supplying of meals to one of plaintiff's employees, by a restaurant keeper, informing him that he might lose some union business if he did not desist. Where-

upon the supplying of the meals was discontinued. There ought to be no question, considering all the evidence of the acts, words, and bearing of defendants, and others engaged with them, in the picketing enterprise, that there was intimidation brought to bear upon the restaurant keeper, and that there would likely be like intimidation to others that might desire to furnish plaintiff or its employees with any goods, merchandise or supplies.

After his premises had been besieged for some time by the defendants' picketing, Kohn posted bulletins in his windows and issued handbills, stating in substance that he was forced to open shop; that he was not unfair to organized labor; that he did not break any agreement with organized labor; that he would not allow organized labor to run his business; that he was paying bigger salaries than the union requires; that his working conditions were better than any other on the avenue; that he had only a small business, and all he had was invested in it; that the union men were attacking him because his business was only a small concern; and that he would not allow the union to destroy his business without a fight. These bulletins and handbills were, in part, couched in language that was offensive, and contained offensive epithets, directed to the members of the organization who were engaged in or were responsible for the picketing of his premises. Defendants insist that on account of the posting and issuance of these bulletins and handbills the plaintiff does not come into court with clean hands, and is, therefore, not entitled to equitable relief. We are unable to accept this view. Some charity should be indulged in favor of one who finding his little business in process of destruction by the unlawful picketing of a large and powerful labor organization, exhibits a spirit of resentment which leads him to the use of intemperate language in his efforts to combat and break the force of the picketing. Moreover, the posting of bulletins and the issuance of handbills occurred only on one day, six or seven weeks before the temporary injunction was issued herein, but the unlawful picketing continued throughout that period.

It is obvious, without discussion, that there is no merit in the contention of defendants that the court erred in admitting evidence of the conduct of the defendants in picketing the premises prior to plaintiff's incorporation.

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Haid, P, J.,* and *Becker* and *Nipper, JJ.,* concur.