RIGGS *v.* TUCKER DUCK & RUBBER COMPANY.

4-5109

Opinion delivered June 6, 1938.

572

*Lyman L. Mikel* and *George W. Dodd,* for appellants.

*Daily & Woods,* for appellee.

SMITH, J. This appeal is from a decree of the Sebastian chancery court, which will be set out *in extenso,* making permanent a temporary injunction previously granted. Three days were devoted to the hearing of the application for the permanent injunction, during the progress of which many witnesses testified. No attempt was made to preserve this testimony or to bring it into the record. The decree awarding injunctive relief refers to the opinion of the presiding judge which directed

that his findings of fact be incorporated in the decree. This was done, and this appeal challenges the correctness of the decree upon these findings of fact, the insistence being that the court awarded relief which was in excess of authority in view of the facts found by the court. In this state of the record the conclusive presumption must be indulged that the testimony supports the court's findings of fact.

The decree containing these findings of fact reads as follows: "Now on this 25th day of September, 1937, being one of the regular judicial days of the September, 1937, term of this court, this cause comes on for final decision on the merits. The plaintiff being present by its attorneys, Daily & Woods, and the defendants being present by their attorneys, I. S. Simmons and L. E. Lister, and said cause having been heretofore taken under advisement upon pleadings of the parties, the oral evidence, and the exhibits adduced in open court, and the briefs of counsel, and the court being well and sufficiently advised in the premises, doth find:

"Plaintiff is a corporation organized under the laws of the state of Arkansas. Its general place of business is at 515 Garrison avenue, Fort Smith, Arkansas, and it maintains and operates factories at 515 Garrison avenue, at 14 North Fifth street, and at Kelley Highway and 'A' street, in said city.

"A large number of the production employees of plaintiff belong to United Brotherhood of Carpenters and Joiners of America Local No. 1651, an affiliate of the American Federation of Labor. These employees, numbering 175 to 180, were called out on a strike July 27th, 1937. Several meetings between officials of the company and the Bargaining Committee of the Local were had before the strike was called. These efforts to settle their differences were unsuccessful. When the strike was called, the membership was organized into groups for the purpose of picketing the different plants and places of business of plaintiff. There were 25 pickets on duty at the Kelley Highway plant, and eight in front of the company building at 515 Garrison avenue. Other

members of the local union- visited the ones doing picket duty, and at times there .were from 15 to 20 striking employees congregated in front of the place at 515 Garrison avenue. Two pickets carried a banner at this place back and forth in front of it, occupying a space of 15 by 23 feet, and at times there were three and four marching abreast.

"These pickets did not attempt to interfere with the office force of the company when they were entering or leaving the buildings. They did accost different ones who entered the building at 515 Garrison avenue and tried to persuade them from making purchases. After purchases were made, they tried to get customers of the company to return the purchases, and actually followed one farmer who lives a few miles away in Oklahoma, and by persuasion and threats caused him to return some cotton pick sacks he had purchased. Later, this customer got a friend of his to secure the sacks for him. On different occasions pickets accosted those who were entering the building to make purchases or were leaving it, and informed them that they were breaking a union picket line, and attempted to persuade them from doing this. Truck drivers were asked not to deliver or haul material for the company, and warned them that to do so might cause trouble.

"At the time the strike was called, the company had seven cars of lumber in transit. Five of these cars were disposed of to other concerns, but no such disposition could be made of two of the cars, and company officials were told by striking employees not to unload them. To prevent demurrage from accumulating, the cars were spotted at the Ballman-Cumming Furniture factory for unloading. A committee of striking employees appeared, and the lumber was not unloaded. Later the cars were sent to Hackett to be unloaded, and some pickets rode the train with the cars, and others went down by automobile, and the cars were not unloaded there. Mr. Peerson, president of the Local, testified that the purpose of having pickets appear at both of these places was to prevent the cars from being unloaded.

"After all this interference, Mr. Tucker, president and principal stockholder of the company, decided to ask for volunteers from his office force and salesmen to assist him in unloading the lumber, and, on the morning of August 13th, 1937, he and Allen Cox, together with eight of the office employees and salesmen of plaintiff went to the plant on Kelley Highway for that purpose. A crowd estimated at from 75 to 100, a majority of whom were striking employees, was on hand when they arrived at the factory. This crowd increased during the day, and at times there were as many as 500 to 600 present. The president of Local Union No. 1651, as well as the chairman of the Bargaining Committee and a score or more of other members of the Local were identified as being present. Many outsiders who were sympathizers and members of other locals of the American Federation of Labor were present. The mayor of the city visited the place on two or three occasions during the day, and two policemen were present all day. Mr. Tucker and his assistants went to the plant in two automobiles, and there was some disturbance as they entered the place. During the day, and as numbers of the mob increased such epithets as 'scab,' 'yellow-belly,' 'snake in the grass,' and names more opprobrious, violent, and vulgar were uttered by the members of the mob. This continued throughout the day, being more violent at times than others, and some of it came from the direction of Hardin Glass plant near by, where men belonging to another local, affiliated with the American Federation of Labor were at work. No personal violence to those unloading the lumber was attempted while the work was going on, but threats of what would happen later were heard.

"Unloading of the car was finished about 5:15 in the afternoon and as the cars carrying Mr. Tucker and his assistants left they were separated from the officers who had been present during the day, and the car being driven by Mr. Staton was stopped and surrounded by a mob on Sixth street. An attempt at personal violence was made by someone, but this was prevented, and one of the striking employees, Chester Riggs, stated that

the man should not be attacked while they were tired, but if necessary, wait until they had had a bath and catch them out on the creek sometime. After the cars proceeded to Garrison avenue, the Staton car was again surrounded and threats of turning the car over and pushing them into the river was made. Mr. Tucker, Mr. Cox, and Mr. Duey were riding in one of the cars, and, seeing the mob surrounding Mr. Staton's car on the avenue, went to the alley leading to the rear of the Garrison avenue place of business, and, after stopping, a truck appeared containing from five to seven men, some of whom were recognized by Mr. Tucker and Mr. Cox, and Mr. Cox was attacked and severely beaten. Both Mr. Tucker and Mr. Duey were knocked down and injured. The Staton car finally proceeded on its way to the Bridge Tire Co. filling-station to let Mr. Pfiefer and Mr. Hardberger out, and, after doing so, proceeded down Fifth street, where other cars containing some of the striking employees followed, and one of them tore away the shirt sleeve of Mr. Staton. Mr. Staton then proceeded with his car to the county jail, and was followed by the pursuing cars. A car containing two women and two men appeared at the Bridge Tire Co. filling-station and one of the men prevented Mr. Pfiefer from entering his car, pulled him back, and invited him to go with them on a ride. Officers appeared and conducted Mr. Pfiefer and Mr. Hardberger to their homes. Later that night, while sitting in his car near his boarding place, Mr. Hardberger was severely beaten by someone, whom he afterwards identified as Jack Craig, an employee of Harding Glass Co., and member of the local union there affiliated with the American Federation of Labor.

"Mr. Fred Huckelberry is the business agent of the local conducting this strike as well as locals conducting other strikes in the city, and has assisted in trying to settle strikes with other concerns whose employees are affiliated with the American Federation of Labor where he has not been employed as their business agent. On the day following the assemblage of the mob at the Kelley Highway plant and other places, Mr. Huckelberry

came to the office of Mr. Tucker and advised him to settle his differences with the local and stated that, if necessary, he could bring together 3,500 men to their assistance. It is in testimony, also, that he stated to Mr. Fitzhugh that he would rather win the strike with the aid of the C. I. O. than to lose it with the aid of the American Federation of Labor. This statement is denied in part.

"It is, therefore, by the court, considered, ordered, adjudged and decreed that the defendants, and each of them, and the agents and employees of each of the defendants, and each and every one of the officers and members of the Local Union of production employees of Tucker Duck & Rubber Company known as the United Brotherhood of Carpenters and Joiners of America, Local No. 1651, and all other persons acting in concert with them, be and they are each hereby permanently enjoined, while on, adjacent to, or near plaintiff's premises at 515 Garrison avenue, 14 North Fifth street, and Kelley Highway and 'A' street, in the city of Fort Smith, Sebastian county, Arkansas, from interfering with plaintiff's business, its customers, prospective customers, or employees, and from picketing or patrolling, or causing to be picketed or patrolled, the plaintiff's premises and the sidewalks or streets or other property adjacent to plaintiff's said premises, with placards or banners designating said places of business as 'unfair to organized labor,' or with placards otherwise so worded as to give said places of business such designation; that the defendants, and each of them, and their agents and employees, and the officers and members of said local union, and all other persons acting in concert with them, be and they are each restrained and enjoined from accosting, detaining or causing to be accosted or detained on the sidewalks or streets adjacent to or on plaintiff's premises any person or persons seeking to enter any one of plaintiff's various places of business for the purpose of dissuading them from patronizing or working for plaintiff, or from calling their attention to any alleged unfairness of plaintiff or its place of business to organized

labor, or from otherwise trying to influence such employees or prospective patrons from entering the service of or patronizing plaintiff's places of business, or from otherwise undertaking to influence patrons of plaintiff's to return goods to plaintiff or to cease to patronize plaintiff. And from threatening, intimidating, or assaulting any of the officers, agents, or employees of plaintiff at any place.

"The court retains jurisdiction of this cause for the purpose of enforcing this final decree.

"It is ordered that the opinion this day filed be made a part of the record in this case. To each of the above findings and to this decree the defendants at the time, and each of them, saved their separate and several exceptions, prayed and were granted an appeal to the Supreme Court of Arkansas, and were given and granted ninety days time in which to prepare and file their bill of exceptions."

The insistence for the modification, if not the reversal, of this decree is that it awards relief in excess of the jurisdiction of the court to grant, in that it enjoins all picketing, whether conducted lawfully or not, and that the decree should, therefore, be modified so as to prohibit only picketing conducted in an unlawful manner.

The first—and we think a sufficient—answer to this contention is that no such issue was made in the answer filed to the complaint in which the court was asked to make permanent the temporary restraining order. The answer filed is in the record, and it asks no such relief. On the contrary, the answer denies that picketing had been conducted unlawfully, and there is no intimation of any intention to modify the methods previously pursued, nor, as we have said, was it asked that the temporary order be so modified that respondents might thereafter picket in a lawful manner.

It is virtually conceded that the decree of the court below must be affirmed unless we modify or overrule the case of *Local Union No. 313, Hotel & Restaurant Employees* v. *Stathakis,* 135 Ark. 86, 205 S. W. 450, 6 A. L. R.

894, as the decree there appealed from was patterned after and virtually copied in the instant case.

It is said that this Stathakis case is ancient law, although that opinion was written by the writer of this. It is said also that public opinion and the view of the courts has since changed, and that this change has been evidenced by such legislation as the Norris-LaGuardia Act passed by the Congress of the United States (29 USCA, §§ 101-115), and by the legislation of several of the states patterned after it. That argument may be answered by saying that the General Assembly of this state has passed no legislation depriving the courts of this state of the power to issue injunctions in labor strikes in proper cases, and the law as announced in the Stathakis Case remains unchanged in this state. It would serve no useful purpose to review this legislation. There has been a contrariety of legislation on the subject. Wisconsin, Oregon and possibly some other states have enacted legislation literally adopting the Norris-LaGuardia Act, and such legislation was upheld as constitutional by the Supreme Court of Oregon, after pointing out that the Supreme Courts of Washington, Massachusetts and New Hampshire had held similar statutes unconstitutional. *Starr* v. *Laundry & Dry Cleaners Union,* 63 Pac. 2d 1104. On the other hand, the Supreme Court of Indiana, in 1924, in the case of *Thomas* v. *City of Indianapolis,* 145 N. E. 550, held (to quote a headnote in that case) that "An ordinance (of the city of Indianapolis) prohibiting picketing, whether accompanied by violence and coercion or not, is not an unreasonable exercise of power to preserve peace and good order given city councils under Burns' Ann. St. 1914, § 8655, cl. 47."

It is unnecessary to consider or determine whether such legislation would be upheld in this state, as we have no such legislation. Neither is it necessary to consider the legislation of Oregon and other states which have restricted the rights of their courts in issuing injunctions in labor disputes, as we have no such legislation.

We repeat again the law as announced in the Stathakis Case remains unchanged in this state. That case

was given the most serious and deliberate consideration and announced views which the majority of the court still entertain. We do not here repeat what was there said. It must suffice to summarize the holdings in that case. They are to the following effect. The right of laborers to organize for the purpose of collective bargaining, or to improve the conditions under which they work, is unquestioned; and so also is their right to go on strike if these demands are not met, and, as a means of enforcing their demands, they have the right, among others, to peaceably picket. But they may not use force, violence, coercion, or intimidation. They must so exercise their right to strike and to picket as not to interfere with the rights of others.

We do not agree that the Stathakis Case is now obsolete and has become an anachronism. It is based upon the simplest and most elementary principles of right and justice. Nor do we agree that it has been repudiated by other courts. The brief of counsel for appellee cites many cases in which it has been approved.

In the case of *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, (which was rendered subsequent to the passage of the Clayton Act, October 15, 1914, c. 323, 38 Stat. 738, but prior to the Norris-LaGuardia Act), Chief Justice TAFT delivered the opinion, in which all of the members of the Supreme Court concurred except Mr. Justice CLARKE. It was said in the opinion in that case, as the chancellor found to be true here, that "It is clear from the evidence that from the outset, violent methods were pursued from time to time in such a way as to characterize the attitude of the picketers as continuously threatening." The discussion of the power and attitude of the courts under these circumstances is so peculiarly applicable to the facts in the instant case that we quote somewhat extensively from it as follows:

"How far may men go in persuasion and communication and still not violate the right of those whom they would influence? In going to and from work, men have

a right to as free passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free.

"The nearer this importunate intercepting of employees or would-be employees is to the place of business, the greater the obstruction and interference with the business and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract attention and congregation of the curious, or, it may be, interested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes. In the present case the three or four groups of picketers, were made up of from four to twelve in a group. They constituted the picket lines. Each union interested, electricians, cranemen, machinists and blacksmiths, had several representatives on the picket line, and assaults and violence ensued. They began early and continued from time to time during the three weeks of the strike after the picketing began. All information tendered, all arguments advanced and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions. The numbers of the pickets in the groups constituted intimidation. The name 'picket' indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work, one of running the gauntlet. Persuasion or communication attempted in such a

presence and under such conditions was *anything* but peaceable and lawful. When one or more assaults or disturbances ensued, they characterized the whole campaign, which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere. Our conclusion is that picketing thus instituted is unlawful and can not be peaceable and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it. We are supported in that view by many well reasoned authorities, although there has been contrariety of view. (Citing many cases).'' Among the numerous cases cited to support this statement of the law is that of *Local Union No. 313, Hotel & Restaurant Employees*, v. *Stathakis*, 135 Ark. 86, 205 S. W. 450, 6 A. L. R. 894.

In the case of *Levy & Devaney, Inc.*, v. *International Pocketbook Workers' Union et al.*, 114 Conn. 319, 158 Atl. 795, the Supreme Court of Errors of Connecticut, after stating that the boundary between lawful and unlawful picketing is that between peaceful persuasion and intimidation, proceeded to say: ''An injunction is granted with reference to what there is reason to expect in its absence When picketing is so unlawful as to indicate that the defendant does not intend to use his rights in a lawful manner, a court may reasonably expect that such unlawful conduct will continue, in the absence of an injunction, and in such case it is within the discretion of the trial court to enjoin further picketing altogether.'' A number of cases were cited in support of that statement of the law.

A later decision of the Supreme Court of Rhode Island, in the case of *Bomes* v. *Providence Local No. 223, etc.*, 51 R. I. 499, 155 Atl. 581, is to the same effect, and additional cases were there cited.

It was insisted in the case of *Joe Dan Market* v. *Wentz*, 223 Mo. App. 772, 20 S. W. 2d 567, as it is here, that the injunction was too broad, but it was there said: ''This insistence is untenable. The picketing conducted by

defendants consisted of one continuous transaction, involving unlawful acts on the part of defendants, and showing, by a systematic course of conduct and concerted action, their intention to accomplish their purpose by unlawful means. In such case equity will do complete justice by enjoining the whole of the unlawful proceedings. Picketing conducted, as this was, accompanied by intimidation, threats, violence, and coercion, soon becomes current in the neighborhood, so that a continuation of the picketing, even though conducted peaceably, would probably, if not necessarily, result in intimidation.''

Among the cases cited and quoted from by appellants for the reversal of the decree are those of *De Agostina* v. *Holmden,* 285 N. Y. S. 909, 157 Misc. 819, and *Goldfinger* v. *Feintuch,* 288 N. Y. S. 855, 159 Misc. 806.

These cases recognize the right to picket peaceably, but not more so than does this court. But it was said in the De Agostina case (November 15, 1935) that ''On the other hand, even peaceful picketing may be enjoined where violence, intimidation, and misstatements have already been resorted to and the course of conduct has been such as to indicate the danger of injury if any picketing whatever is allowed.''

In the case of *Nann* v. *Raimist,* 174 N. E. 690, 255 N. Y. 307, 73 A. L. R. 669, Court of Appeals of New York (1931), there appears a quotation in the opinion, which was written by CARDOZO, C. J., and in which all the justices concurred, reading as follows: '' 'Where unlawful picketing has been continued, where violence and intimidation have been used, and where misstatements as to the employer's business have been distributed, a broad injunction prohibiting all picketing may be granted.' *Exchange Bakery & Restaurant* v. *Rifkin, supra,* at page 269 of 245 N. Y., 157 N. E. 130. 'The course of conduct of the strikers' is then 'such as to indicate the danger of injury to property if any picketing whatever is allowed.' *Ibid.*''

The authorities are too numerous to attempt any review of them, and while many of the cases have been considered we find no reason to modify the statement of the law announced in the Stathakis case.

We repeat again the issues involved in the trial of this cause in the court below was not that of the right to picket peacefully. The chancellor in his opinion quoted from the Stathakis case, which expressly recognized that right. The appellants did not ask a modification of the temporary restraining order to that effect. On the contrary, they denied having violated any law, or any of the rights of their employer, and there was manifested an intention to continue the conduct they had previously pursued. It was evidently the view of the court below that the right of picketing peacefully could not be made the excuse for the concerted plan of intimidation, coercion and violence which the pickets were employing, not only with the approval, but at the instigation of their leaders.

The decree is, therefore, correct and will be affirmed.

HUMPHREYS, MEHAFFY and DONHAM, JJ., dissent.

DONHAM, J. (dissenting). I concur in the majority opinion in so far as it upholds the right to enjoin coercion and violence; but I do not agree that peaceful picketing may be regarded as the instrument or agency of violence so as to be the subject of injunctive relief; and I most certainly do not agree that such picketing may be permanently enjoined.

Counsel for appellee state in their brief: "We recognize that appellants and their associates had the unqualified and untrammeled right to organize, to join a labor union and to strike collectively in aid of their demands. They had the further right to peacefully picket in order to advertise their grievances to the public." To all of which, I heartily agree.

A similar statement is found in the majority opinion as follows: "The right of laborers to organize for the purpose of collective bargaining or to improve the conditions under which they work is unquestioned; and so also is their right to go on strike, if these demands are not met, and, as a means of enforcing their demands, they have the right, among others, to peacefully picket."

If these admitted rights of the laborers involved in the instant case had been given effect in the court's decree

and the majority opinion had approved the decree, I would not dissent. If the rights of appellants had been protected by an application of these agreed principles of law, there would be no room for a dissenting opinion. But, instead of giving effect to these agreed statements of the law, the lower court entered a decree which the majority opinion herein approves, permanently prohibiting peaceful picketing.

Pertinent portions of this decree are as follows: "The defendants and each of them, and the agents and employees of each of the defendants, and each and every one of the officers and members of the local union of pro·· duction employees of Tucker Duck & Rubber Company, known as the United Brotherhood of Carpenters and Joiners of America, Local Union No. 1651, and all other persons acting in concert with them, be and they are each hereby permanently enjoined, while on, adjacent to, or near plaintiff's premises . . . from picketing or patrolling, or causing to be picketed or patrolled, the plaintiff's premises and the sidewalks or streets or other property adjacent to plaintiff's said premises with placards, or banners, designating said places of business as unfair to organized labor, or with placards otherwise so worded as to give said places of business such designation. That the defendants and each of them, and their agents and employees, and the officers and members of said local union, and all other persons acting in concert with them, be and they are each restrained and enjoined . . . from calling their attention (meaning any person or persons, including company employees, seeking to enter any of plaintiff's various places of business) to any alleged unfairness of plaintiff or its place of business to organized labor, or from otherwise trying to influence such employees or prospective patrons from entering the service of or patronizing plaintiff's places of business."

Thus, it is seen that while the majority opinion recognizes the right of laborers who go on strike to peacefully picket, as an abstract principle of law, the majority actually deny that right to appellants in the instant case by approving the trial court's decree enjoining appellants

from exercising the right. To this, I cannot agree. It is an inconsistency which I cannot approve.

Within the last few years, to be exact July 5, 1935, the Congress of the United States, recognizing that denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, passed what is known as the National Labor Relations Act. Section 157 of this act is as follows: ''Employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.''

Section 158 of the act provides that certain practices on the part of employers shall be regarded as unfair labor practices. Some of these are as follows:

''To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in § 157; to dominate or interfere with the formation or administration of any labor organization; to discriminate in regard to hire or tenure of employment or any term or condition of employment; to encourage or discourage membership in any labor organization; to discharge or to otherwise discriminate against an employee because he has filed charges or given testimony under the act; ;to refuse to bargain collectively with the representatives of his employees.''

Of course, the provisions of the National Labor Relations Act apply only to employees engaged in interstate commerce; but it is cited here for the purpose of showing the trend of public opinion and legislation on the subject.

It is not so much a difference of opinion as to the legal principles involved that prompts this dissent; but it is a failure of the majority to give effect to these legal principles in the instant case. It is a failure to apply them to which I object and dissent. It is not enough that the majority opinion recognizes the right to peacefully picket. The recognition of this right should be carried into the decree. Unless the decree is so modified as to

give effect to the right of peaceful picketing, the mere statement of the right as an abstract principle of law avails no one anything.

It is stated in the briefs that since this appeal has been lodged, the appellee has made peace with the labor union and has taken back into its employ the strikers who were enjoined from peaceful picketing. This injunction is permanent, and, according to the decree, it must continue for all time. Suppose the employees of this labor union, who are employed by appellee, are in the future unable to agree with their employer and because of the disagreement they see fit to go out on strike. The decree of the trial court which the majority opinion approves would prevent them from peacefully picketing. The decree does not even limit the period of time during which it is effective, but, as stated, it prevents picketing, even though peaceful, for all time, thus, depriving appellants forever from the exercise of a lawful right; and this is true even in the face of the fact that this court, and practically all other courts in this country, recognize the right of striking employees to peacefully picket.

It is my opinion that the decree which the majority opinion approves is too broad. It should be modified so as to uphold the right of peaceful picketing in the instant case. Because the majority failed to give effect to that right, I have felt constrained to dissent.

Justices Mehaffy and Humphreys join me in this dissent.