[L. A. No. 17777. In Bank. Mar. 3, 1942.]

FRED STEINER et al., Respondents, v. LONG BEACH LOCAL NO. 128 OF THE OIL WORKERS INTERNATIONAL UNION (an Unincorporated Association) et al., Appellants.

D. A. Boone and James T. Satchell for Appellants.

Pierson & Block, Samuel P. Block and Ralph Pierson for Respondents.

EDMONDS, J.—Upon a complaint charging that officers and members of a labor union had entered into a conspiracy to picket the refinery of the Elm Oil Company and that they were conducting both picketing and boycotting by means of false representations and with acts of violence, a preliminary injunction issued. By that order, the superior court

enjoined the union and its agents from picketing or boycotting by means of force, violence or intimidation. Upon a trial the injunction was made permanent and its terms were broadened to prohibit all. picketing and boycotting. Damages in the sum of $2,500 were also awarded. The appeal is from that judgment.

The controversy between the parties arose over the demand made upon the owners of the refinery to sign a closed shop contract with a labor union, and the question for decision concerns the right of an employer to injunctive relief when picketing goes beyond the bounds of peaceful persuasion. More specifically, the court is called upon to determine whether or not all picketing and boycotting may be enjoined when an employer shows that those acting in behalf of the union have used violence, physical intimidation and other means of illegal coercion in the endeavor to attain their purpose.

The respondents, as partners, own and operate a business in the city of Long Beach. Under the firm name of Elm Oil Company they refine crude petroleum oil and sell the products obtained therefrom. The appellants are Long Beach Local No. 128 of the Oil Workers International Union, its officers and some of its members. The union is an affiliate of the Congress of Industrial Organizations.

By their complaint, the respondents alleged that the appellants entered into a conspiracy to injure and damage their business by picketing the premises; that no labor dispute existed between them and their employees, but on the contrary, the latter were entirely satisfied with respect to hours of labor, working conditions, wages, and all other matters connected with their employment; that their employees were not members of the C.I.O. union, were not desirous of becoming members thereof, and had expressed their desire to continue work under terms of their own choosing without the assistance of or interference from any labor organization; that the appellants, for the purpose of unionizing the respondents' business and to force their employees to join the union, caused pickets to be stationed about the premises; and that such picketing was conducted by means of violence, threats, intimidation, coercion, menacing conduct, and false representations. These asserted acts of unlawful conduct were set forth with particularity.

Further allegations of the complaint were that the respon-

dents had valuable contracts with others for the purchase of crude oil; that by means of violence and threats, the appellants intimidated such persons from continuing to do business with them; and that by reason of the appellants' conspiracy and acts in pursuance thereof, they have suffered injury and damage to their business. The prayer was for a decree enjoining the appellants from in any manner picketing their place of business, or from in any manner interfering with their business, the business of persons dealing with them, or with their employees. In addition, damages in the sum of $25,000 were sought. Upon this complaint, a preliminary injunction issued limiting the number of pickets to be stationed about the plant during the pendency of the suit and enjoining the appellants from picketing or boycotting by means of force, violence, or intimidation.

By way of answer to the complaint, the appellants admitted the picketing of the respondents' place of business but denied the allegations of violence, threats and intimidation, asserting that the picketing was at all times carried on in a peaceful manner. As an affirmative defense they alleged that the partners had refused to negotiate with them and by means of threats and promises of favor, had forced their employees into stating that they were satisfied with their working conditions; that the working conditions in the respondents' plant with respect to wages and hours were less favorable to the employees than those which obtained in plants employing union labor, and had a tendency to break down and destroy advantages which had been established by the union; and that by reason of the respondents' acts, the appellants caused a picket line to be placed around their premises for the purpose of informing the public generally, and the persons connected with the industry, that Elm Oil Company was unfair to organized labor.

Upon the issues so framed, the case went to trial and the court made findings in substantial accordance with the allegations of the complaint. These findings, in the main, are based upon uncontradicted evidence which shows the following facts: Following the refusal of the respondents and their employees to negotiate with the union concerning a closed shop contract, a picket line was placed in front of the oil plant. At the outset, there were forty to fifty pickets. The number was then reduced, but until the date of the termination of the trial there were pickets on duty about the premises for twenty-four hours a day. At all times, the

picketing was conducted under the supervision of the appellants Forrester and Coulter, both of whom were officers and representatives of the union.

Upon innumerable occasions, trucks of companies hauling oil for the respondents were followed by pickets in automobiles for long distances. Both Coulter and Forrester participated in this shadowing. Because of these actions, one truck company refused to haul any more oil for the respondents unless they protected the drivers against physical harm. To meet this demand, armed guards were provided.

The respondents' employees and their wives were followed by pickets, including Forrester. There is testimony that both the men and the wives were greatly frightened and harassed by these actions. At one time, the wife of an employee who had brought her husband's lunch to him was followed by two pickets in an automobile. The wife of another employee was also followed. This time two men employed by the oil company gave chase. Thereupon, the car containing the pickets stopped, and the appellant Booth, upon being questioned by one of these employees concerning the motive in following the woman, challenged him to a fight. Upon one occasion, Forrester followed an employee to his home after dark and drove back and forth in front of the house, causing the man and his wife great fright and annoyance. Forrester also followed the respondent Kindseth after dark.

During the picketing, those representing the union directed vile, abusive and insulting language at the respondents' business callers and employees. Threats of physical violence were embodied in some of this language, much of which is too vile to be here stated. At another time, the appellant Coulter approached an employee, who was engaged in gauging trucks at the oil plant, and told him that "in labor trouble people had been hurt, that there had been no violence in the Elm Oil Company case to date, but from that day on, he, J. C. Coulter, was not giving Brown any further protection."

Several trespasses were committed by pickets upon the property of the respondents. When a customer of the oil plant drove his car on to the premises, two of the pickets rushed at him and "grabbed at" him, and the appellant Benton threatened him with bodily harm. Upon another occasion, pickets blocked the driveways of the premises so

as to prevent a truck belonging to one of the respondents' business visitors from leaving the plant. Another picket paraded in front of the premises carrying a pole on the end of which was a piece of cheese. Pickets threw rocks at the premises, hitting cars, tanks and trucks. At times, the pickets falsely represented to business callers that a strike was in progress at the plant. Moreover, the following of employees and customers, and the use of threatening and intimidating language toward them, continued after the issuance of the preliminary injunction prohibiting such conduct.

■ It is now settled law that workmen may lawfully combine to exert various forms of economic pressure upon an employer, provided the object sought to be accomplished thereby has a reasonable relation to the betterment of labor conditions, and they act peaceably and honestly. (*Lisse* v. *Local Union,* 2 Cal. (2d) 312 [41 Pac. (2d) 314]; *McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal. (2d) 311 [106 Pac. (2d) 373].) This right is guaranteed by the federal Constitution as an incident of freedom of speech, press and assemblage (*Thornhill* v. *Alabama,* 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093]; *Carlson* v. *California,* 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104]), and it is not dependent upon the existence of a labor controversy between the employer and his employee. (*McKay* v. *Retail Auto. S. L. Union No. 1067, supra; C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal. (2d) 389 [106 Pac. (2d) 414]; *American Federation of Labor* v. *Swing,* 312 U. S. 321 [61 S. Ct. 568, 85 L. Ed. 855].)

■ But the constitutional guarantee of freedom of speech extends no further than to confer upon workmen the right to publicize the facts of an industrial controversy by peaceful and truthful means. Labor has no sanctuary in any federal right when it departs from the bounds of peaceful persuasion and resorts to acts of violence, physical intimidation, or false statement. Under such circumstances, picketing loses its character as an appeal to reason and becomes a weapon of illegal coercion.

■ These principles both authorize and require courts to enjoin acts of violence or acts which amount to physical intimidation. (*Lisse* v. *Local Union, supra; McKay* v. *Retail Auto. S. L. Union No. 1067, supra.*) Furthermore, the inherent power of a court of equity to grant injunctive relief is not limited to the imposition of a restraint against the vio-

lent and unlawful conduct, but may, under given conditions, be exercised to enjoin future picketing in any form. Prior picketing interwoven with continuous acts of violence and physical intimidation may create such fear and hostile attitude in the public, and in those persons desirous of business relations with the employer, that future picketing, even though conducted peaceably, would probably, if not necessarily, be regarded as sinister in purpose. The ban of the injunction against the illegal conduct would not be a sufficient remedy, under such circumstances, because acts otherwise peaceful would have a coercive influence when done with a background of violence. Accordingly, where past picketing has become so irrevocably blended with acts of violence, physical intimidation or other unlawful conduct as to give rise to a justifiable belief that future picketing is likely to result in a continuance of the illegal acts, an injunction restraining a labor organization from any and all picketing lies within the equitable power of the court and does not constitute an infringement of the right of free speech.

This is the rule which was very recently stated and applied in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287 [61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200], where the United States Supreme Court upheld the right of a state court to enjoin acts of picketing in themselves peaceful, when they were enmeshed with accompanying violent conduct which was unlawful. In that case the court declared: ''It was in order to avert force and explosions due to restrictions upon rational modes of communication that the guarantee of free speech was given a generous scope. But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution. . . . And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. . . . In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful. . . . Nor can we say that it was written into the Fourteenth Amendment that a state through its courts cannot base protection against future coercion on an inference of the continuing threat of past misconduct.''

The Meadowmoor case does not stand alone, nor are the principles upon which it was decided of recent origin. Many

other jurisdictions have authorized an injunction against all picketing where labor's acts have been so entangled with violence and other illegal conduct that future excesses might reasonably be anticipated in the light of what was done before. (*Vaughan* v. *Kansas City Moving Picture Operators' Union,* 36 Fed. (2d) 78; *Levy & Devaney* v. *International Pocketbook Workers' Union,* 114 Conn. 319 [158 Atl. 795]; *Joe Dan Market* v. *Wentz,* 223 Mo. App. 772 [20 S. W. (2d) 567]; *Keuffel & Esser* v. *International Assoc. of Machinists,* 93 N. J. Eq. 429 [116 Atl. 9]; *Exchange Bakery & Restaurant* v. *Rifkin,* 245 N. Y. 260 [157 N. E. 130]; *Nann* v. *Raimist,* 255 N. Y. 307 [174 N. E. 690]; *Steinkritz Amusement Corp.* v. *Kaplan,* 257 N. Y. 294 [178 N. E. 11]; *Busch Jewelry Co.* v. *United Retail Employees' Union,* 281 N. Y. 150 [22 N. E. (2d) 320, 124 A. L. R. 744]; Am. Law Inst. Restatement, Torts, vol. 4, sec. 816; see cases collected in 132 A. L. R. 1218.) The rule is particularly applicable where violent picketing is continued in defiance of a preliminary injunction restraining the defendants from resorting to violence or physical intimidation. Under such circumstances, the probability of a recurrence of the unlawful conduct is great, and the violators should be allowed no further opportunity for wrongful conduct under the protection of a judgment given upon terms which have been previously ignored. (*Nann* v. *Raimist, supra*; *R. A. Freed & Co.* v. *Doe,* 283 N. Y. Supp. 186.)

█ It is true that an injunction prohibiting all picketing may not be based upon isolated and episodic acts of violence or other unlawful conduct. An injunction issues only to protect against future irremedial harm, and where the picketing has been in general lawful but has been accompanied by infrequent illegal acts not of a serious character, only the unlawful conduct will be enjoined. Disassociated acts of past misconduct do not evidence an illegal intention and purpose on the part of labor, nor do they so stigmatize its conduct as to warrant a sweeping restraint against future picketing upon the ground that a recurrence of the illegal acts is likely despite a prohibition against the unlawful conduct. As stated in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, supra,* ". . . the right of free speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force."

█ Applying these principles to the facts of the present case, the injunction of the trial court must be upheld insofar as

it prohibits picketing about the premises of the respondents and their customers. There is ample support for the findings concerning a series of acts which go far beyond what may reasonably be termed peaceful picketing. The use of vile and abusive language and threats of violence amounts to physical intimidation which may not be justified under any principles governing the rights of persons engaged in labor disputes. The following of the respondents' business callers and employees and the wives of employees is in the same category. Implicit in such shadowing is a threat of physical violence. The futility of a ban against this unlawful conduct alone is demonstrated, not only by its continuity, but also by the fact that it was conducted in the face of a preliminary injunction.

The appellants refer to these acts as the isolated acts of pickets unauthorized by the union and therefore not binding upon it. To call such acts isolated is to close one's eyes to the proved facts of the case. True, acts of actual physical assault and damage were rare. But threatened violence was common, for the conduct of the union representatives in following business callers and employees, and in resorting to vile language and threats, was continuing, uninterrupted and thoroughly enmeshed with the picketing carried on by them.

The appellants challenge, as prejudicial error, the refusal of the trial court to receive evidence that the union's officers instructed its pickets to refrain from violence or intimidation of any character. However, the uncontroverted evidence shows that the picketing was conducted under the direction of Forrester and Coulter, who, it is asserted gave these instructions. Much of the violence and disorderly conduct was committed during their presence at the oil company's plant and with their tacit approval. Also, according to their own testimony, they participated in the shadowing of employees and customers.

Under the well-settled rule that it is not reversible error to exclude evidence which could not affect the decision upon a material fact (2 Cal. Jur. 1022), the appellants may not successfully challenge the refusal of the trial court to hear evidence of instructions which would not exonerate them from responsibility. Certainly instructions violated by the officers who issued them are no shelter to the union. The entire picketing plan was planned and carried out by the union, and it is responsible for the acts of its pickets committed within the scope of their agency and with the sanction of its officers. As

the court declared in *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, supra,* ". . . It is true of a union as of an employer that it may be responsible for acts which it has not expressly authorized or which might not be attributable to it on strict application of the rules of *respondeat superior."*

The appellants seek to avoid the application of the rule announced in the Meadowmoor case upon the ground that the decision was made upon evidence showing the use of extreme physical violence of a most brutal nature, resulting in serious personal injuries and property damage to the picketed employers, their employees and the public. However, insofar as the propriety of an injunction prohibiting all picketing is concerned, no logical distinction may be drawn between picketing enmeshed with actual violence and picketing carried on with threatened violence and physical intimidation. If past picketing is entangled with violent threats and physical intimidation, future misconduct on the part of the pickets and justifiable apprehension of physical harm on the part of the employers, employees, and the public, may be as reasonably anticipated as in cases of actual physical violence. If the unlawful threats and intimidation are sufficiently continuous and extensive, the prohibition of the unlawful conduct only will not serve to remove the coercive effect of the picketing. Since the acts committed by the appellants were not isolated but formed a chain of physical intimidation characterizing the whole picketing as illegal, the trial court was entirely justified in issuing the broad and comprehensive restraint.

Many of the cited cases in which an injunction against all picketing was upheld were decided upon facts which did not include any evidence of extreme physical violence. In *Busch Jewelry Co.* v. *United Retail Employees' Union, etc., supra,* cited with approval in the Meadowmoor case, pickets blocked the entrances to retail stores and by such action prevented customers from entering; they intimidated employees by threats of personal violence and coercion; they used loud and obscene language and made false and fraudulent statements; by violence and threats they prevented customers from paying their bills; they picketed the homes of employees and customers; and they conducted snake dances in front of the picketed stores. As in the present case, however, there were only isolated instances of actual physical violence. In affirming a decree of the trial court enjoining the defendants from picketing the stores, the Court of Appeals declared: ". . . If

a trial court can ever grant an injunction against continuing picketing where the picketing has been carried on with violence and will be in the future, this is such a case.''

In *Levy & Devaney* v. *International Pocketbook Workers' Union, supra,* a labor organization sought to induce the unionization of a factory by picketing. Employees were followed to and from their work on various occasions, but there were no acts of physical violence. A judgment restraining all picketing was affirmed with the declaration: ''When picketing is so unlawful as to indicate 'that the defendant does not intend to use his rights in a lawful manner, a court may reasonably expect that such unlawful conduct will continue, in the absence of an injunction, and in such case it is within the discretion of the trial court to enjoin further picketing altogether.''

Another case of the same character is *Joe Dan Market* v. *Wentz, supra.* The plaintiffs, owners of a retail grocery store and butcher shop, sought to enjoin the picketing of their place of business. Pickets walked to and fro in front of the premises so close to the entrance as to interfere with the ingress and egress of patrons; they used abusive language towards customers; their conduct was so boisterous that large crowds gathered; on several occasions the pickets were intoxicated and followed patrons who had left the store; and several persons desiring to trade in the store were accosted. In addition, a few assaults were committed. Rejecting the defendants' contention that the decree of the trial court was too broad in restraining lawful as well as unlawful picketing, the court held: ''The picketing conducted by defendants consisted of one continuous transaction, involving unlawful acts on the part of defendants, and showing, by a systematic course of conduct and concerted action, their intention to accomplish their purpose by unlawful means. In such case equity will do complete justice by enjoining the whole of the unlawful proceeding. Picketing conducted as this was, accompanied by intimidation, threats, violence, and coercion, soon becomes current in the neighborhood, so that a continuation of the picketing, even though conducted peaceably, would probably, if not necessarily, result in intimidation.''

In support of their position that under the evidence which has been stated, only unlawful conduct may be enjoined, the appellants cite *Pierce* v. *Stablemen's Union*, 156 Cal. 70 [103

Pac. 324]; *Southern California Iron & Steel Co.* v. *Amalgamated Association*, 186 Cal. 604 [200 Pac. 1], and *Lisse* v. *Local Union, supra.* But in those cases, the court was not called upon to determine whether acts, which are otherwise peaceful, may be enjoined when picketing has been carried on with a background of violence, and they are not controlling in a determination of the rights of the parties to the present suit.

However, the injunction from which the present appeal was taken must be modified insofar as it prohibits acts which may be done peacefully without picketing. The conduct of the appellants in the vicinity of the Elm Oil Company's plant and in connection with the boycotting of firms with whom the respondents have business relations justified the trial court in concluding that future activities of that character would continue to be carried on with the coercion of physical intimidation or violence. But peaceable discussion away from the situs of former violence may not be enjoined.

The remaining question for decision concerns the award of $2,500 damages. It is the position of the appellants that as the respondents failed to prove any actual damage, they were entitled to nominal damages only. On the other hand, the respondents urge that general damages may be awarded upon a showing of unlawful interference with their business, and that the elements constituting such damage need not be proved. Admittedly, no physical injury was done to the respondents, nor did they show any loss of profits, but they demanded damages upon the theory that the appellants had wrongfully interfered with their right to carry on a lawful business. The trial court gave judgment accordingly.

Generally speaking, the principle underlying the right to damages for injury is that the person injured is entitled to compensation commensurate with his loss. It is not sufficient to prove the infringement of a legal right; to recover more than merely nominal damages, the injured person must prove the amount or items of the damage suffered by him. As stated in 25 C. J. S. 788, ". . . A presumption of at least nominal damage follows from proof of a legal wrong. However, the amount and items of pecuniary damage are not presumed, but must be proved; and if there is no evidence as to the extent of the pecuniary loss there can be no recovery of substantial damages, at least where the elements of damage are such as to be susceptible of pecuniary

admeasurement.'' The rule is applicable to a tortious interference with a business. (*Hammer* v. *Baum*, 136 Misc. 490 [240 N. Y. Supp. 145]; *St. Germain* v. *Bakery & Confec. Workers Union*, 97 Wash. 282 [166 Pac. 665, L. R. A. 1917 F, 824].) Where an established business is wrongfully interrupted and injured, the proper measure of damages is the diminution in value of the business traceable to the wrongful · act, as reflected by loss of profits, expenses incurred or similar concrete evidences of injury. (*Lambert* v. *Haskell*, 80 Cal. 611 [22 Pac. 327]; *Barnes* v. *Berendes*, 139 Cal. 32 [69 Pac. 491, 72 Pac. 406]; *Berry Foundry Company* v. *International Moulders Union*, 177 Mo. App. 84 [164 S. W. 245].)

The appellants seek to invoke the rule as to measure of damage in nuisance cases in which damages are allowable without any showing of exact pecuniary loss. In those cases, however, the principal damage suffered consists of injuries to the senses, physical discomfort, and personal annoyance, all of which is incapable of mathematical ascertainment. But the gravamen of the present action, insofar as the right to damages is concerned, is not an invasion of personal security but an interference with business, the damage to which is susceptible of precise computation. The damage resulting from such unlawful interference cannot be divorced from tangible injury to property and loss of profits. Personal discomfort and annoyance are not compensable elements of damage in such a case.

That part of the judgment which enjoins the appellants from doing certain acts is modified by striking therefrom the provisions ''(d) Inducing any one to refrain from selling crude petroleum oil to plaintiffs'' and ''(e) Interfering in the contractual relations between plaintiffs and their employees''; as so modified it is affirmed. The judgment, insofar as it awards damages, is reversed for a new trial upon that issue. Costs on appeal shall be borne by the respective parties.

Shenk, J., Curtis, J., and Houser, J., concurred.

CARTER, J., Dissenting.—I dissent.

The inevitable effect of the majority opinion in this case will be the abrogation of the constitutional guarantees of freedom of speech, press and assembly, and, for all practical purposes, will operate as a denial of the right of organized labor to exercise those rights by engaging in peaceful picketing;

that is, the publicizing of a labor dispute, which rights were unequivocally declared to be protected against abridgment by a state by the Fourteenth Amendment to the Constitution of the United States in *Thornhill* v. *Alabama,* 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093], and *Carlson* v. *California,* 310 U. S. 106 [60 S. Ct. 746, 84 L. Ed. 1104].

In order that we may have a more complete picture of the factual situation in the instant case, I will refer to the facts found by the trial court with reference to the character of the picketing here involved. The majority opinion in its statement of facts has gone beyond the findings of the trial court, disregarding the elementary rule that the findings of fact must support the judgment, and if they do not, the judgment must be reversed. The findings may be summarized as follows: That the plaintiffs are engaged in the business of refining and selling petroleum and its products, employing thirteen employees; that defendant Long Beach Local No. 128 of the Oil Workers International Union, affiliate of defendant C. I. O., is the local branch of the Oil Workers International Union; that there has never been a labor dispute between plaintiffs and their employees and the latter are not and do not wish to become members of defendant union or its affiliate; that no contract has ever existed between plaintiffs and defendants; that defendants conspired to "unionize" plaintiffs' business and their employees, to cause said employees to become members of defendant union and plaintiffs to enter into a closed-shop contract and discharge nonjoining employees; that to accomplish the purpose of the alleged conspiracy, defendants picketed plaintiffs' premises, the pickets wearing arm bands with the words "C. I. O. Picket" thereon, there being forty to fifty pickets at the outset, fifteen or twenty for about the first week thereafter, and varying numbers during twenty-four hours a day thereafter; that on March 23, 1939, defendant Forrester, a representative of defendant union, followed one of the plaintiffs around the block after dark; and that on one occasion two pickets followed the wife of one of plaintiffs' employees away from plaintiffs' premises, and on another occasion followed the employee and his wife in an automobile; that some of the defendants on one occasion followed one of the employees on foot and in a car; that there were five other instances when employees and their wives were followed off of plaintiffs' premises by certain of

the defendants, and an employee at one time requesting the reason for his fellow employee's wife being followed was asked by one of the defendants if he wanted to fight; that on several occasions plaintiffs' customers or business callers were followed away from plaintiffs' premises (this conduct occurred during the month of March and early part of April, 1939); that during January, February and March, five of plaintiffs' employees were informed by various of the defendants in effect that unless they joined defendant union, plaintiffs' plant would be closed and they would never get work in the oil fields; that business callers at plaintiffs' premises were told not to deal with plaintiffs, to which some acceded, and some firms doing business with plaintiffs were picketed; that on various occasions abusive and insulting language was directed at plaintiffs' business callers and employees; that on one occasion a picket paraded in front of the premises carrying a pole on the end of which was a piece of cheese, and shook the pole at plaintiffs' premises; that Baker, a business caller of plaintiffs' "drove his car into the premises of plaintiffs and on into the private driveway of plaintiffs, driving in such a manner as to pass very close to the defendant F. G. Benton; that two of the defendant pickets rushed at Baker and grabbed at him, and that the defendant F. G. Benton, at said time and place, took off his jacket and threatened Baker with bodily harm" . . .; that on one occasion the pickets blocked plaintiffs' driveway with a car and prevented a business caller of plaintiffs' from driving his truck off plaintiffs' premises. On one occasion one of defendants entered plaintiffs' premises without their consent and made a telephone call.

It must be remembered that during all of the time covered by the above findings, picketing which was unquestionably peaceful was being regularly pursued; none of the defendants were ever charged with or found guilty of contempt for violating the preliminary injunction issued by the trial court.

It should also be noted that the *trial court did not consider* the picketing to be violent or not peaceful or that violence was so interwoven with peaceful conduct that it could not be effectively restrained without the enjoining of all picketing. The court specifically found:

## "XIII.

"That at all times during which pickets were maintained

about the premises of the Elm Oil Company, the officers and employees of the company went to and from their work daily through the picket line and were at no time physically or bodily injured in any way, nor was any person physically or bodily injured while coming to or going from the plaintiffs' premises; and at no time was any of the tangible property of the Elm Oil Company injured.

## "XIV.

"That when the trucks and cars of officers, employees and customers of the Elm Oil Company were followed by officers, members and pickets of the Union, at no time were any such trucks or cars stopped or attempted to be stopped or the driver and passengers of any such cars or trucks detained or attempted to be detained by, or engaged in conversation by any of the officers, members or pickets of the Union so following said cars and trucks.''

Nevertheless, the trial court issued a blanket injunction against all picketing. In order to support that decree the majority decision relies upon the case of *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287 [61 S. Ct. 552, 85 L. ed. 836, 132 A. L. R. 1200]. It must necessarily, as it does, concede that picketing is lawful and will not be enjoined even though there is no dispute between the employer and his employees, and none of the employees are members of the picketing union. A union may lawfully picket an employer for the purpose of obtaining a closed-shop contract, and unionizing the employer's employees. (*McKay* v. *Retail Auto. S. L. Union No. 1067,* 16 Cal. (2d) 311 [106 Pac. (2d) 373] ; *Lund* v. *Auto Mechanics' Union No. 1414,* 16 Cal. (2d) 374 [106 Pac. (2d) 408] ; *C. S. Smith Met. Market Co., Ltd.* v. *Lyons,* 16 Cal. (2d) 389 [106 Pac. (2d) 414] ; *American Federation of Labor* v. *Swing,* 312 U. S. 321 [61 S. Ct. 568, 85 L. Ed. 855].

Turning then to the sole foundation of the majority decision, the case of *Milk Wagon Drivers' Union* v. *Meadowmoor Dairies, Inc., supra,* we find at the outset that under no possible theory may it be applied to the case at bar. Assuming for the moment that in that case the Supreme Court of the United States announced the rule that if the background of peaceful picketing consists of unlawful acts which are so inseparably interwoven with the peaceful picketing that it is impossible to give adequate relief without restraining all

picketing, both tortious and nontortious, all picketing may be restrained, the fact remains that the *trial court in the instant case made absolutely no finding that such conditions existed.* The existence thereof is necessarily a factual problem upon which the trial court should exercise its discretion and judgment. If anything, the clear implication from the above quoted findings XIII and XIV, is that the trial court was of the opinion that *no such conditions existed.* But an examination of the record in this case shows beyond any doubt that the trial court did not even have the rule of the Meadowmoor case in mind, and did not even contemplate or consider its applicability to the case at bar. The judgment in the instant case was entered on March 4, 1940. The Meadowmoor case was decided on February 10, 1941, nearly a year later. In its oral opinion in this case the trial court stated:

"The McKay case has been decided by the District Court of Appeals, and it is now being argued yesterday and today, and it may go on for some time before the Supreme Court of this state. Whether there is a point there that can go to the Supreme Court of the United States on a writ of error, I don't know. There may be. We do not know when the conclusion of this thing will come, but upon this theory of trial and error, we will get there eventually, and we will have a definite conclusion on this thing. *The matter now stands that a District Court of Appeal in this state has said that there is a labor policy in this state based upon freedom* of the individual employee to form a contract with an employer or not to have one, and he has the right not to have it disturbed in any way by anybody unless he chooses that person as his representative to disturb it. . . .

"There is only one case coming under the Labor Code in this state that has been decided by the Appellate Court that I know of—or three—those three cases that are now before the Supreme Court. They are the Lyons and all of those, which have no discussion of labor code situation in them at all. That code says that the individual right of freedom shall not be disturbed in any way. The McKay case says in effect, in my opinion, that if a labor union comes in and attempts to unionize a plant where it has no employee whom it represents, that the effect of that may be to force the employer to help compel his employees to join the union. That, the court says, will be an interference with his freedom. . . .

"I am not the lawmaker. It is the Legislature which said that the individual working man shall be given the preference, and I think that is what it does. If that is unconstitutional and the upper courts say so, very well—we will have to conform—but so far the District Court of Appeal has said that the freedom of the individual to do as he pleases, whether it conforms to the great majority, and by failing to conform may do harm, which minorities always do—they do harm from the point of view of the majority always—that the Legislature has said that principle of freedom of action absolutely untrammeled by anybody shall exist in the employee, and once he has made his decision, unless there is a labor dispute, the union cannot come in and interfere with that set-up so as to make it even probable that the employer might try to change that policy of the employee being a non-union man if he wants to be. . . .

"On the limited part of it—preventing violence and that sort of thing, *but under my theory of this case, it is illegal to picket at all. It is not a question of whether the picketing is done peacefully or otherwise.* Upon my theory of the case the Labor Code made it impossible to picket at all under these circumstances, and that, under that declared labor policy, the labor union had no right to go out there and interfere with these people at all in any way whatever. . . .

"*The right to picket, in my opinion, not existing in this case, or the right to interfere with this business at all—would make it proper to have a complete injunction and that is what I will grant in this case, an injunction total in its effect, preventing the defendants from interfering with this business in any way whatever* so far as the problems involved in this case are concerned." It is obvious that the trial court decided the instant case solely upon *one legal proposition,* that is, *that plaintiffs were entitled to an injunction against the picketing because there was no labor dispute between the employer and its employees.* It cannot be criticized for so deciding the case because at the time of its decision the case of *McKay* v. *Retail Auto. S. L. Union No. 1067, supra,* had been decided by the District Court of Appeal, and that court had held, contrary to the later holding of this court, *that under the Labor Code picketing was unlawful when there was no labor dispute between the employer and his employees.* (See 90 Pac. (2d) 113, May 5, 1939.) It was not until October 14, 1941, more than

a year after the trial court's judgment, that this court announced a contrary rule. (*McKay* v. *Retail Auto. S. L. Union No. 1067, supra.*) The case of *American Federation of Labor* v. *Swing, supra,* stating the rule as announced by this court in the McKay case was decided by the Supreme Court of the United States on February 10, 1941. It inescapably follows therefore that not only was the instant case tried and decided upon a theory wholly foreign to the Meadowmoor case, but furthermore, the doctrine of that case was not even considered or contemplated by the parties, counsel or the court. Yet the majority opinion is based wholly upon that doctrine which is utterly without support in the findings of the trial court. The United States Supreme Court recognized the necessity for a finding of fact to support the doctrine of the Meadowmoor case, stating at page 555:

"It is not for us to make an independent valuation of the testimony before the master. We have not only his findings but his findings authenticated by the state of Illinois speaking through her supreme court. We can reject such a determination only if we can say that it is so without warrant as to be a palpable evasion of the constitutional guarantee here invoked. The place to resolve conflicts in the testimony and in its interpretation was in the Illinois courts and not here. To substitute our judgment for that of the state court is to transcend the limits of our authority." But the majority opinion here is not disturbed about the lack of such findings, it not only announces the rule of law, but decides the issues of fact, thereby invading the province of the trier of facts to weigh the evidence and exercise his discretion as to its sufficiency and pass upon the credibility of witnesses. If the case had been tried and decided upon that doctrine there would have been in all probability much evidence introduced bearing upon the question of whether the public, plaintiffs' customers and their employees were justifiably in terror and fear of physical injury, whether efforts to control the unlawful conduct would be unavailing, and the like. In effect, the parties have not had a trial on that issue or the opportunity to present a case bearing thereon, and the majority opinion deprives them of those rights.

Still assuming that the Meadowmoor case in fact announces as the view of the United States Supreme Court, the doctrine ascribed to it by the majority opinion, there is another rea-

son why it is manifestly not applicable to the case at bar. Here there was no such background of violence as was present in the Meadowmoor case. In that case it was said at page 554:

"Witnesses testified to more than fifty instances of window-smashing; explosive bombs caused substantial injury to the plants of Meadowmoor and another dairy using the vendor system and to five stores; stench bombs were dropped in five stores; three trucks of vendors were wrecked, seriously injuring one driver, and another was driven into a river; a store was set on fire and in large measure ruined; two trucks of vendors were burned; a storekeeper and a truck driver were severely beaten; workers at a dairy which, like Meadowmoor, used the vendor system, were held with guns and severely beaten about the head while being told 'to join the union'; carloads of men followed vendors' trucks, threatened drivers, and in one instance shot at the truck and driver. In more than a dozen of these occurrences, involving window-smashing, bombings, burnings, the wrecking of trucks, shootings, and beatings, there was testimony to identify the wrongdoers as union men. . . .

"The question which thus emerges is whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously *violent* conduct which is concededly outlawed." (Emphasis added.) In the case at bar as seen from the findings heretofore discussed, the most that occurred were a few isolated acts of unlawful conduct such as the blocking of plaintiffs' driveway, abusive language, and perhaps an assault. No physical violence was found; no property was damaged; there were no threats of physical violence or property damage; there is no evidence whatsoever of any concerted plan or scheme to engage in a continuous and concerted campaign of violence with the aim of terrifying and physically intimidating the public, or plaintiffs' customers or employees. Yet the majority opinion concludes that "Prior picketing interwoven with *continuous* acts of violence and physical intimidation may create *such fear and hostile attitude in the public,* and in those persons desirous of business relations with the employer, that future picketing, even though conducted peaceably, would probably, if not necessarily, be regarded as sinister in purpose."

There is not one scintilla of evidence in the case at bar that

there was created a "fear and hostile attitude" on the part of the public. The followers of plaintiffs' employees and customers never stopped or even communicated with the persons followed. Those things occurred *away from the employer's premises* where the picketing was in progress, and as far as appears, the public knew nothing of it, and were not aware that there was any relation between the shadowing and the picket line. Because one or a few pickets sporadically used abusive language and followed employees and customers is certainly not a background of violence as contemplated by the Meadowmoor case. Even the courts of Illinois which gave birth to this doctrine have subsequently squarely held that it is strictly limited to acts of violence on a large and extensive scale as distinguished from unlawful acts not characterized by acts of violence. In *2063 Lawrence Ave. Bldg. Corporation* v. *Van Heck*, 377 Ill. 37, 35 N. E. (2d) 373, decided June 17, 1941, the Supreme Court of Illinois stated at page 374:

"From the cases just referred to [the Meadowmoor case and others] it is definitely settled that to enjoin all picketing it must be found that *violence* has given the picketing a coercive effect whereby it would operate *destructively as a force* and intimidation, and it further appears to the court from the circumstances, that peaceful picketing in the future would be enmeshed in violence, threats or coercion by intimidation." (Emphasis added.) In the instant case there was no violence and no evidence indicating that the violence "would operate destructively as a *force.*" Even if it be conceded that there was some violence, it cannot be claimed upon any interpretation of the evidence that that violence consisted of more than *two or three isolated instances*. In *Ellingsen* v. *Milk Wagon Drivers' Union, etc.,* 377 Ill. 76, 35 N. E. (2d) 349, the conduct as outlined by the court in its opinion was far more serious than that occurring in the case at bar, yet the decree of the lower court was *reversed* because it enjoined all picketing. The court stated at page 353:

"This brings us to a consideration of the acts of violence and intimidation alleged to have been committed in connection with the picketing in this case. The master found that there was evidence of *intimidation by threats;* that some of the conversation of the pickets was such as to amount to an attempt to coerce the storekeeper to give up the sale of the milk of the milk company and to prevent the delivery of other

merchandise by *preventing drivers going to the store who had sold the merchandise to the storekeeper.* An examination of the evidence shows that in some instances the pickets sought to interfere with customers, such as attempting to *prevent the purchase of chocolate milk* by children who had purchased and were drinking it, by telling them: 'You will get sick drinking that stuff. Do you know how they get that chocolate milk? They go to the toilet and get it.' In other instances drivers delivering other products *were told they could not go in.* In one instance the picket stood in front of the doorway and *prevented a driver from delivering orange juice* which he had sold to the storekeeper, and by *obstructing the doorway and gesturing prevented the deliveryman from entering.* Other evidence is that delivery drivers were told 'to get to hell out of here' when they stopped. Other instances were that the pickets declared that drivers would get into trouble if they went into the store. Another witness testified that a picket told him: 'Don't enter there. Don't open the door or step into that store.' That the witness replied: 'Business is business,' to which the picket added: 'If you are smart about it, don't you know some day we will get even with you?' The master finds that the Union instructed the pickets not to engage in conversation with the storekeeper, or any one else, but that they violated those instructions. The master also found that the evidence shows that one of the stores picketed was caused to lose at least one customer by statements of the pickets amounting to an attempt to coerce." (Emphasis added.) And again at page 354:

"The record in this case does not, however, contain evidence tending to indicate that threats or statements such as were made are apt to become an element of future picketing. The master found, and the officers of the defendant union testified without dispute, that the *pickets were instructed they were not to talk to any one while on picket duty, were not to obstruct the business of the stores and were to use no force or violence.* This case is, under and above-described record, to be distinguished from the Meadowmoor case, where the record justified the restraining of non-tortious acts of picketing as well as acts of violence and threats." (Emphasis added.)

It is said in the majority decision "The appellants challenge, as prejudicial error, the refusal of the trial court to

receive evidence that the union's officers instructed its pickets to refrain from violence or intimidation of any character. However, the uncontroverted evidence shows that the picketing was conducted under the direction of Forrester and Coulter, who, it is asserted, gave these instructions. Much of the violence and disorderly conduct was committed during their presence at the oil company's plant and with their tacit approval. Also, according to their own testimony, they participated in the shadowing of employees and customers.'' It is obvious that the majority opinion completely ignores the nature of defendants' claim as a ground for reversal. They offered to prove that the pickets had been expressly instructed to avoid acts of violence and unlawful conduct. Their offer was refused. Surely such evidence was admissible upon the question of the responsibility, if any, of the members of the union not actually participating in the picketing. It was for the trial court to give it the weight it deserved rather than for this court in effect to hold that such evidence was wholly inadmissible. For that reason alone the judgment should be reversed. But there is even more significance to be attached to the refusal of the offer of that evidence. It has a direct bearing upon the issue of whether defendants' tortious conduct was so enmeshed with the lawful conduct that it would not be possible to control the unlawful conduct except by enjoining all picketing. It goes directly to the question of whether there was a concerted and continuous plan and course of conduct aimed at creating a fear of physical injury in the public and plaintiffs and their employees. If the pickets were expressly instructed against violence, then as to the nonparticipating members of the union, it would tend to establish that the acts were merely isolated and episodic rather than an inseparable part of a campaign of violence. The Meadowmoor case concedes that isolated and episodic acts are not sufficient to bring into operation the doctrine announced in that case. Yet the majority opinion without any finding by the trial court on the question, and with no evidence bearing thereon before it, (it having been excluded), proceeds to declare the case appropriate for a blanket injunction.

In the foregoing discussion I have assumed that the Supreme Court of the United States announced, in the Meadowmoor case, *as its own,* the doctrine ascribed to it by the majority decision. That, however, is not the case and that so-

called doctrine cannot and should not be declared to be the law in this state. The Supreme Court of the United States was very careful to point out in the Meadowmoor case, that the courts of the state of Illinois in the exercise of their equity powers could if they chose, adopt such a doctrine without doing violence to the constitutional guarantee of freedom of speech. It did not declare that such doctrine was a policy of which it approved. The court stated at page 554:

"The question which thus emerges is whether *a state can choose to authorize its courts* to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed. The Constitution is invoked to deny Illinois the power to authorize its courts to prevent the continuance and recurrence of flagrant violence, found after an extended litigation to have occurred under specific circumstances, by the terms of a decree familiar in such cases. Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is to deny to the states *their historic freedom to deal with controversies through the concreteness of individual litigation* rather than through the abstractions of a general law." (Emphasis added.) And at page 556:

"But we do not have revisory power over state practice, provided such practice is not used to evade constitutional guarantees. See, *Fox River Paper Co.* v. *Railroad Comm.*, 274 U. S. 651, 655, 47 S. Ct. 669, 670, 71 L. Ed. 1279; *Long Sault Development Co.* v. *Call,* 242 U. S. 272, 277, 37 S. Ct. 79, 81, 61 L. Ed. 294. We are here concerned with power and *not with the wisdom of its exercise.* We merely hold that in the circumstances of the record before us the injunction authorized by the Supreme Court of Illinois does not transgress its constitutional power. *That other states have chosen a different path in such a situation indicates differences of social view in a domain in which states are free to shape their local policy.*" (Emphasis added.) It follows, therefore, that the Supreme Court of the United States did not, in the Meadowmoor case, pass upon the wisdom or propriety of what might be called the "enmeshment with violence" doctrine. Each state is wholly free to adopt the course, with respect to

that doctrine, it believes to be most compatible with justice and the constitutional guarantees. The majority opinion treats the issue as wholly new in California and as having never been decided. That is not true. It has heretofore been established by this court that the scope of an injunction in a picketing case should be limited to a restraint upon only the tortious acts, and that a decree restraining peaceful picketing as well as tortious acts must be modified. In *Pierce* v. *Stablemen's Union,* 156 Cal. 70, 80 [103 Pac. 324], this court said with reference to an injunction restraining all picketing:

"In conclusion, then, and applying these principles to the injunction here under consideration, it appears that, while the injunction was properly granted, it was broader in its terms than the law warrants. It was, for example, too broad in restraining defendants from 'in any wise interfering with' plaintiff's business, since the interference which we have discussed, of publication, reasonable persuasion, and threat to withdraw patronage, is legal and such as defendants could employ. So, also, was the injunction too broad in restraining defendants from 'intimidating any customer by boycott or threat of boycott' since, as has been said, the secondary boycott is likewise a legal weapon." In *Southern Cal. Iron & Steel Co.* v. *Amalgamated Assn.,* 186 Cal. 604, 620 [200 Pac. 1], this court stated:

"The judgment as entered, however, is *too broad in its terms, in that it purports to prohibit acts which may or may not be unlawful,* according to the purpose for which they are done, and it does not clearly couple the acts with the unlawful purpose. Thus, for example, the placing of pickets near respondent's place of business for a purpose not at all connected with said business and not for the purpose of intimidating employees of respondent, so as to coerce them to quit that employment, nor for the purpose of intimidating persons intending to become employees of respondent, so as to prevent them from doing so, could not appropriately be enjoined, since such an act would not be wrongful as against the respondent and would not be calculated to injure the respondent's business. The judgment is not clearly expressed in other respects, and it is therefore liable to be misunderstood in the enforcement thereof if it should be violated. Consequently, it should be modified in these particulars." (Emphasis added.) See also, to the same effect, *Lisse* v. *Local Union No. 31,* 2 Cal.

(2d) 312 [41 Pac. (2d) 314]. While those cases may not have given minute consideration to the so-called enmeshment with violence doctrine, they clearly and unequivocally hold that an injunction which enjoins all picketing, where there are both tortious and nontortious acts, cannot stand. I take it therefore, that the doctrine has been repudiated in California at least, implicitly if not expressly.

The reasons are forceful and numerous why the doctrine should not become a part of California jurisprudence. It is tantamount in its practical operation to a prohibition of picketing as a means of publicizing a labor controversy; it declares forfeited and permits unjust abridgment of the constitutional guarantee of freedom of expression. It is a backward step in the struggle against government by injunction and all its attendant evils. (Frankfurter & Greene, The Labor Injunction, (1930) p. 200.) The process has been slow whereby peaceful picketing reached its status as being within the protection of the Constitution, reaching its goal in *Thornhill* v. *Alabama, supra.* Heretofore the courts in civil liberties cases have zealously prevented states from infringing those liberties even though a desirable public advantage was the goal sought to be attained. (*Cantwell* v. *Connecticut,* 310 U. S. 296 [60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352]; *Thornhill* v. *Alabama, supra*; *Schneider* v. *State,* 308 U. S. 147 [60 S. Ct. 146, 84 L. Ed. 155]; *Lovell* v. *Griffin,* 303 U. S. 444 [58 S. Ct. 666, 82 L. Ed. 949].)

Trial courts whose social views are antagonistic to the rights of labor in its struggle will find the doctrine an easy means whereby the right of freedom of expression may be completely destroyed any time some questionable act is committed in the course of a bitter labor dispute. No matter what the provocation for the particular misconduct, the court may attempt to justify a blanket injunction against picketing on the ground that that was the only method of meeting the situation.

The only two possible theories upon which the doctrine may be based are, first, that the background of violence lends a "coercive thrust" to the subsequent peaceful picketing and thereby makes it in fact violent and physically intimidating. That is apparently the basis of the Meadowmoor case. Second, that by committing tortious acts, the right of freedom of expression is forfeited. (See cases collected, 132 A. L. R. 1218.) Those theories are equally untenable.

The first rests upon a rule so vague and indefinite in its outlines that its fair application is practically impossible in face of the cardinal principle guiding the issuance of injunctions that there must be certainty and precision. How many acts are necessary to establish a background of violence with a coercive thrust? What must be the character of such acts? When in point of time must the acts have been committed? How can it be ascertained that it is impossible to control and prevent the tortious acts unless all picketing is restrained? What portion of the public must be aware of the tortious acts *before* they are physically intimidated? Is the injunction being used as an instrument to prevent crimes (a field in which equity will not act) or to protect the employer from being picketed? As pointed out by Mr. Justice Black (Mr. Justice Douglas concurring) in his dissenting opinion in the Meadowmoor case, the standard for guidance is impossible to grasp. He said:

"On the one hand it is said that 'dissociated acts of past violence' are not enough to forfeit the right of free speech. On the other hand a 'background of violence' appears to be sufficient. Nor are any more definite standards or guides to be found in such clauses as 'context of violence;' 'entanglement with violence;' 'coercive effect;' 'taint of force;' and 'coercive thrust.' It is my apprehension that a rule embodying such broad generalizations open up new possibilities for invasion of the rights guaranteed by the First Amendment." The doctrine insofar as it is based upon a "background of violence," that is, past misconduct violates the elementary principle in the issuance of injunctions that they are given to prevent future misconduct but never to punish past misconduct. An injunction is a preventive rather than punative remedy. (14 Cal. Jur. 175, 176, 209, 210.)

The second theory is equally unsound. As we have seen, an injunction is not an instrument for punishment. Therefore, it should not be used as a weapon to declare that a person's constitutional right of freedom of expression is forfeited because he is guilty of some tortious conduct. On that theory one tortious act alone would require a declaration of the forfeiture of one's constitutional right. The ramifications of such a rule when applied to analogous situations are startling to say the least. Assuming that an injunction would lie to restrain the utterance or printing of slander or libel, then

a person who made or printed one or more slanderous or libelous statements could be perpetually enjoined from henceforth either speaking or writing. If a blanket injunction against peaceful picketing which is undeniably lawful may be issued where one or more tortious acts are committed in the course thereof, then a newspaper publisher who printed one or more libelous articles could be totally debarred from thereafter publishing his paper under any and all circumstances; the freedom of the press would be completely lost. A person making a slanderous utterance could be completely and permanently silenced upon all subjects. A person who persisted in diverting more water from a stream than that to which he was entitled could be enjoined from diverting any water from the stream although he had an unquestioned right to a certain quantity.

I can think of no logical reason, and none is advanced by the majority opinion as to why the courts cannot enjoin tortious conduct without sacrificing the constitutionality guaranteed civil liberties in the process. I see no valid reason why the courts cannot exercise adequate and efficient control over picketing by limiting its coercive process to tortious conduct. It is not acting alone in its effort in that respect. The entire machinery of the criminal law is available and ready, able and willing to thwart and punish acts of violence. To adopt the doctrine of the majority opinion is equal to the expression of a belief that that machinery is helpless and fails to function.

The authorities from other jurisdictions cited in the majority opinion as supporting a blanket injunction were all either decided prior to or failed to take into consideration the Thornhill and Carlson cases which placed the right to picket squarely on the constitutional guarantees of freedom of speech, press and assembly. The reasoning in those cases is practically the same as that which appeared in the earlier authorities which held all picketing unlawful asserting that by the very nature of things peaceful picketing was a misnomer because such a thing could not exist. They merely give word or lip service to the principle of freedom of expression while arriving at a conclusion which for all practical purposes destroys that principle.

Especial reliance is placed upon the case of *Busch Jewelry Co.* v. *United Retail Employees' Union*, 281 N. Y. 150 [22 N.

E. (2d) 320, 124 A. L. R. 744], but in a later case in that state, *May's Furs and Ready to Wear* v. *Bauer,* 282 N. Y. 331, 26 N. E. (2d) 279, in the course of the picketing there were acts of violence and disorderly conduct, arrests and convictions following in the case of the latter, nevertheless the court modified an injunction restraining peaceful picketing, stating at page 284:

"Second, the injunction forbids defendant to engage in activities which are altogether lawful. It has often been said by the courts of this State that an injunction is protection for the future and not punishment for the past. *Nann* v. *Raimist, supra* [255 N. Y. 307, 174 N. E. 690, 73 A. L. R. 669]; *J. H. & S. Theatres, Inc.* v. *Fay, supra* [260 N. Y. 315, 183 N. E. 509]. That defendant has committed acts of violence, which would be repeated but for the staying hand of equity entitles plaintiffs to protection against such conduct; but just as plaintiffs are entitled to engage in their lawful pursuits, free from unlawful interference, so defendant is entitled for its lawful purposes to employ all means which are lawful. *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468, 483, 57 S. Ct. 857, 81 L. Ed. 1229; *Goldfinger* v. *Feintuch, supra,* 276 N. Y. at page 288, 11 N. E. (2d) 910, 116 A. L. R. 477. It is not the function of courts to supervise labor controversies. The task is sufficiently difficult when confined to preventing the parties from overstepping the bounds of lawful conduct. Section 876-a clearly confirms the right to engage in peaceful picketing and other lawful modes of persuasion. The injunction, therefore, was improper in including many peaceful and lawful activities which are enumerated among the proscriptions.

"In *Nann* v. *Raimist, supra,* it was held to be beyond the power of this court to review the exercise of the 'chancellor's discretion' in restraining all activities if violence had been committed. Even so, the discretion of the 'chancellor' was allowed only a narrow scope. *Wise Shoe Co.* v. *Lowenthall, supra* [266 N. Y. 264, 194 N. E. 749]. And now, since the enactment of section 876-a, the 'chancellor' is confined to restraining only unlawful acts. Thus the right of peaceful picketing is clearly established in this State (*cf. Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 59 S. Ct. 954, 83 L. Ed. 1423; *Schneider* v. *State of New Jersey, Town of Irvington* [308 U. S. 147] 60 S. Ct. 146, 84 L. Ed. [155],

decided November 22, 1939, and the constitutionality of the act of the Legislature has been recognized. *Goldfinger* v. *Feintuch, supra* [276 N. Y. 281, 11 N. E. (2d) 910, 116 A. L. R. 477].

"In the Busch case a majority of this court read the record as disclosing a situation completely permeated by violence and as affording *no ray of hope* that the defendant would engage in other than violent picketing. The rule of that case presents an exception which is verbal rather than real, for since defendant would have engaged only in violent picketing, the unqualified prohibition of picketing operated *only on* the *one kind of picketing* present in that situation, viz., *violent* picketing. In that case peaceful picketing was out of the question. In the case at bar *there is no finding to that effect,* and so far as the record bears upon this issue, it appears that defendant has reformed its conduct in a more peaceful direction since the institution of this suit." (Emphasis added.) (See also, *Miller* v. *Gallagher,* 176 Misc. 647 [28 N. Y. Supp. (2d) 606].)

From an examination of the record in the case at bar, it is obvious that no consideration whatsoever was given to the theory upon which the Meadowmoor case was decided, and neither the evidence nor the findings are sufficient to justify the application of the doctrine announced in that case to this case. The attempt by the majority of this court to apply the doctrine of the Meadowmoor case to the case at bar cannot be justified upon any rational theory, and when the facts of this case as determined by the trial court are considered in the light of the rules of law applicable thereto, as announced in the authorities which I have cited herein, it necessarily follows that the judgment should be reversed.

Gibson, C. J., and Traynor, J., concurred.

Appellants' petition for a rehearing was denied March 30, 1942. Gibson, C. J., Carter, J., and Traynor, J., voted for a rehearing.