[Civ. No. 21729. Second Dist., Div. Two. Oct. 3, 1956.]

A. S. NAHAS et al., Respondents, v. LOCAL 905, RETAIL CLERKS INTERNATIONAL ASSOCIATION (an Unincorporated Association), etc., et al., Appellants.

Gilbert, Nissen & Irvin for Appellants.

Sheppard, Mullin, Richter, Balthis & Hampton, George R. Richter, Jr., and Edwin H. Franzen for Respondents.

ASHBURN, J.—Here presented is another facet of the recurrent problem of adjusting the right of free speech, in the form of picketing, with an owner's exclusive right to use his private property. Defendant union and its secretary-treasurer appeal from a judgment enjoining them from conducting any picketing upon or within a certain area held to be the private property of plaintiffs.

On November 29, 1954, plaintiffs, engaged in business as partners under the name Nahas Department Store Number 4, opened a variety type department store at 1250 West Redondo Beach Boulevard in the city of Gardena. It is located upon a 10-acre tract of land, a "shopping center," owned by Victor C. Hornung and wife, who leased to plaintiffs on

July 1, 1954, a building 82 x 150 feet in size, together with the right to use the surrounding parking lot (and apparently the private streets, sidewalks, alleyways and courts) in common with Hornung's other tenants and their patrons and customers. The store faces Redondo Beach Boulevard to the north and is surrounded by parking areas. In front is one about 66 feet deep and to the rear a much larger one. Immediately in front and in the rear of each building is a sidewalk, the one in front being 11 feet wide and in the rear 6 feet. A public sidewalk also runs along the front of the premises on the southerly side of Redondo Beach Boulevard. West of the Nahas store is Von's supermarket, the two being separated by a private road 38 feet wide. There were no other tenants or buildings on the property at the times of the occurrences now under examination.

Local 905, Retail Clerks International Association, is a local union chartered by the American Federation of Labor to represent sales clerks and other related employees in the retail variety and department store field. Efforts to obtain a collective bargaining agreement from Nahas, which had been started before the store was opened, proved unsuccessful, and the local began a drive to organize the employees. To that end a picket line was established upon each of said sidewalks adjoining the store in the front and the back. The pickets carried signs reading: ''Please Do Not Patronize— This Store Refuses to Sign a Union Contract'' or ''Please Do Not Patronize Nahas Department Store—A. F. of L. Picket Line.'' In the parking areas the union caused automobiles to be placed at strategic points displaying similarly worded banners. This began on December 10, 1954. Demand was made that the pickets withdraw from plaintiff's private property. This was refused and the picketing continued until a temporary restraining order was issued on December 17th. It was followed by a preliminary injunction and the permanent injunction from which this appeal is taken. After December 17th the union pickets paraded on the public sidewalk on the south side of Redondo Beach Boulevard.

The judgment enjoins the defendants and each of them, ''their officers, employees, agents, members, representatives, organizers, and attorneys'' from ''[s]tationing, placing, or maintaining any picket or pickets or other person or persons either in vehicles or on foot anywhere in the areas surrounding plaintiffs' store building which is private property occupied by and subject to the control of the plaintiffs, that

is to say anywhere within the territory bounded on the North by Redondo Beach Boulevard and on the East of the property line parallel with Budlong Avenue and on the South by 155th Street and on the West by Normandie Avenue. . . ." Also, "from placing or maintaining on any car parked in any of the parking areas located anywhere on the premises described hereinabove any signs or printing of any nature whatsoever containing the words 'Please Do Not Patronize— This Store Refuses to Sign a Union Contract' or 'A. F. of L. Picket Line' or any other signs or printing specifically referring to the existence of a picket line or labor dispute involving the plaintiffs' store." The theory of the ruling is expressed in these conclusions: "That the property upon which the defendants, their agents, employees, and representatives were picketing was private property. . . . That the defendants, their agents, employees, and representatives had no lawful right to picket upon said private property. . . . That the activities of the defendants, their agents, employees, and representatives, in picketing on said private property amounted to a continuing trespass working irreparable injury to the plaintiffs. . . . That the activities of the defendants, their agents, employees, and representatives, in picketing on the private property leased to the plaintiffs interfered with the right of the plaintiffs in the quiet and peaceful enjoyment and use by them of their said property so leased to them and caused said plaintiffs irreparable injury."

Defendants-appellants argue that this is a denial of their right of free speech expressed through the pickets and the car banners. Plaintiffs say that the injunction is limited to an area which is their private property, that the pickets are not employees, and that the right to exclusive use of one's own property precludes trespass thereon by nonemployee pickets.

The extent to which the rights of the employer as owner of his plant must yield to the demands of union organizers is largely defined in *National Labor Relations Board* v. *Babcock & Wilcox*, 351 U.S. 105 [76 S.Ct. 679, 100 L.Ed. 975], decided April 30, 1956. It deals with three cases of employers who prohibited distribution, within their privately owned parking lots, of union literature by representatives engaged in organizational efforts, not employees of the company. The National Labor Relations Board had found this to be an unfair labor practice by the company, relying on *National Labor Relations Board* v. *LeTourneau Co. of Georgia,* one of several cases reported *sub nom. Republic Aviation*

*Corp. v. National Labor Relations Board,* 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081]. The Babcock & Wilcox opinion holds ". . . that an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution. In these circumstances the employer may not be compelled to allow distribution even under such reasonable regulations as the orders in these cases permit." (P. 552.) The court differentiated the LeTourneau case upon the ground that it dealt only with activities of employees upon the master's premises, and further said on page 552: "This is not a problem of always open or always closed doors for union organization on company property. Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other. The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize. . . . Here the Board failed to make a distinction between rules of law applicable to employees and those applicable to nonemployees.

"The distinction is one of substance. No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline. . . . But no such obligation is owed nonemployee organizers. Their access to company property is governed by a different consideration. The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others. Consequently, if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property. No such conditions are shown in these records. . . . The Act requires only

that the employer refrain from interference, discrimination, restraint or coercion in the employees' exercise of their own rights. It does not require that the employer permit the use of its facilities for organization when other means are readily available." See also *National Labor Relations Board* v. *Monsanto Chemical Co.* (9th Cir.), 225 F.2d 16, 20-21; certiorari denied, 351 U.S. 924 [76 S.Ct. 780, 100 L.Ed. 1454].

While the Babcock & Wilcox case and the Monsanto Chemical Co. controversy arose upon findings by the National Labor Relations Board of the existence of an unfair labor practice under § 8(a)(1) of the Taft-Hartley Act (29 U.S.C.A. § 158(a)(1)), and superficially do not rest upon a constitutional basis, the discussion actually goes to that depth and deals with the fundamental adjustment of rights of speech and rights of private property. Hence, the statutory origin of controversy in those cases does not detract from their authority when applied to a dispute arising in intrastate commerce, as at bar. Moreover, the statutory declarations of policy found in the federal act (29 U.S.C.A. § 157),[1] and in our Labor Code, section 923,[2] are substantially the same. "The principle espoused by section 923 is essentially the same as that fostered by the National Labor Relations Act, namely, the right of workmen to enjoy free collective bargaining over terms and conditions of employment." (*Nutter* v. *City of*

---

[1] 29 U.S.C.A. § 157: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

[2] Labor Code, section 923: "In the interpretation and application of this chapter, the public policy of this State is declared as follows: Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

*Santa Monica,* 74 Cal.App.2d 292, 298 [168 P.2d 741].) The cited authorities are binding precedents so far as they go, whether viewed from a constitutional or statutory standpoint.

However, those cases deal with the dissemination of literature and personal solicitation rather than picketing, which is something more than free speech even when conducted peacefully. (*Building Service Emp. Intl. Union* v. *Gazzam* (1950), 339 U.S. 532, 536, 537 [70 S.Ct. 784, 94 L.Ed. 1045].) "Here, as in *Hughes* v. *Superior Court,* 339 U.S. 460, *ante,* 985, 70 S.Ct. 718, we must start with the fact that while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is 'indeed a hybrid.' " (*International Brotherhood* v. *Hanke,* 339 U.S. 470, 474 [70 S.Ct. 773, 94 L.Ed. 995, 1001, 13 A.L.R.2d 631].) Ordinarily, picketing is addressed to the public, not the employees, as witness the signs used by appellants' representatives in this case. ". . . [P]eaceful picketing consists of bringing the facts to the attention of the general public by means of one or more persons stationed about the place of employment which is being picketed. So conducted, peaceful picketing is an attempt to bring to bear upon the picketed employer the pressure of the opinion of such portion of the public as may be sympathetic to the objects of the picketing organization, by inducing that portion of the public to cease dealing with the picketed business. . . ." (*People* v. *Spear,* 32 Cal.App.2d 165, 168 [89 P.2d 445].) Of course it is not necessarily limited to the public as its objective. (*In re Bell,* 19 Cal.2d 488, 497 [122 P.2d 22].) No case of which we are aware has gone so far as to hold that the employers' property may be invaded and occupied by nonemployees for the purpose of picketing. The "broader perspective" (applied in *Northwestern Pac. R.R. Co.* v. *Lumber & S. W. Union,* 31 Cal.2d 441, 446-447 [189 P.2d 277]) may dictate that "the public welfare tip the scales in favor of preventive relief" in such a situation. But, as will appear from the later discussion of trespass, there is no necessity of here deciding whether any such extension of the Babcock & Wilcox doctrine is appropriate.

No question of discriminatory use of the employers' property arises at bar and the evidence does not afford basis for any finding that the employees of Nahas were "isolated from normal contacts" of union representatives, as in the case of men spending their entire time in the employer's mining

camp or aboard his ship. No showing of inability to contact employees through normal channels was made or attempted at the trial of the instant case. ■ The burden of establishing such overriding necessity of occupying the employers' premises obviously rests upon the union. All that appears is that when Mr. Morriss, business representative of the local, wanted to organize the Nahas employees he arranged on November 19th a lunch-time meeting at a drive-in stand on Redondo Beach Boulevard; that nine employees were present and six membership applications were then obtained; on or before December 11 seven more such applications were procured. Concerning the matter of what constitutes inability to contact employees through normal channels see footnote 1 on page 550 of the Babcock & Wilcox decision, and the last paragraph of the text on page 553.

■ Appellants argue that it was error to refuse to find upon their plea ''That there was no other place or way for plaintiffs' employees who are members of the defendant Local 905 to publicize their dispute through peaceful picketing of the customer entrances of plaintiffs' store except by using the sidewalks in front of and behind plaintiffs' store for that purpose.'' The thesis is that the customers of plaintiffs and the general public could not be reached effectively except through picketing upon the 10-acre parcel and the sidewalks thereon. This is beside the point. Inability to reach the employees for proselyting purposes is the criterion of a right to use the employers' premises for that purpose; inability to reach actual or prospective customers adds nothing to the union's claim of right to use the employers' property. A finding on this subject, if made, would be immaterial and the trial judge so held.

Appellants also say that the court erroneously ignored the rights of plaintiffs' own employees to use the master's premises for organization purposes because it appears that at least five of the pickets were employees as well as union members and the injunction runs against the union and all its members. The record discloses, however, that these persons not only had gone on strike, thus suspending their status of employees (*Mark Hopkins, Inc.* v. *California Emp. Com.*, 24 Cal.2d 744, 749 [151 P.2d 229, 154 A.L.R. 1081]), but had also given up their jobs. ■ There is no specific finding on this matter of voluntarily terminating their employment, but if it were held that this did not occur and that their employment was merely suspended, nevertheless their status

of strikers would terminate any right they otherwise might have to occupy the employers' premises for organizational purposes. During the period through which they were rejecting the obligations of employment they could not be heard to claim any of the rights or benefits thereof.

For the foregoing reasons we conclude that, in this case, union organizers and strikers were not entitled to occupy the employers' private property for their picketing activities. The assumption that they were doing so requires a closer look at the lease and supplement thereto.

If the parking area, sidewalks, etc., were not the private property of plaintiffs, the second major question which counsel discuss does not arise. Both sides argue the effect of *Marsh* v. *Alabama,* 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265], and *Tucker* v. *Texas,* 326 U.S. 517 [66 S.Ct. 274, 90 L.Ed. 274]. Appellants claim that the sidewalks and parking lot in question had been thrown open to public use in such manner and to such extent as to place them on a parity with public streets under the cited cases, and that the question of technical trespass fades away. Respondents say that this argument rests upon a faulty factual premise, namely, that they had opened the use of the property to persons other than actual and prospective customers; that there was in this instance a continuing trespass upon their private property which was properly enjoined by the lower court.

In *Marsh* v. *Alabama, supra,* the court dealt with a company-owned town wherein all property, including streets, sidewalks, alleys, etc. were owned by the private company. Distribution of religious literature upon those streets by a member of Jehovah's Witnesses gave rise to the litigation; the witness was charged with violation of a statute forbidding the entry or remaining on premises of another after being warned not to do so. The Supreme Court held that in the necessary balancing of the rights of free speech and control of private property the mere state of title to the street which was open to the use of all could not control the issue. Speaking through Mr. Justice Black, the court said at pages 505-506: "We do not agree that the corporation's property interests settle the question. . . . Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." Mr. Justice Frankfurter, concurring, said: "[T]he technical distinctions

on which a finding of 'trespass' so often depends are too tenuous to control decision regarding the scope of the vital liberties guaranteed by the Constitution." (P. 511.) The statute was held invalid as applied to the activities of the Jehovah's Witness. The same holding was made in *Tucker* v. *Texas, supra,* which involved a town entirely owned by the United States government.

In *Marshall Field & Co.* v. *National Labor Relations Board,* (7th Cir.) 200 F.2d 375, the rights of nonemployee union organizers to carry on their activities in various parts of the Marshall Field store were involved. One of the areas was a company-owned street which extended through the store from one public street to another. It was used to a limited extent by company employees and the public to enter the building. The labor board held that a company rule which prohibited organizational activities in said private street was pro tanto invalid. The court upheld this ruling upon the authority of *Marsh* v. *Alabama, supra,* 326 U.S. 501.

Counsel for both sides argue the question of whether the sidewalks and parking area involved herein are and have been open to the public to such an extent as to place them on a parity with public streets for picketing purposes. As above indicated we do not reach that problem because the factual basis for the discussion is not supplied by the evidence. Those areas were not and are not owned by plaintiffs-respondents, nor do they hold the same under an exclusive lease.

The original lease of July 1, 1954, was made by Victor C. Hornung and wife as lessors to Nahas as lessee. It describes the leased property as follows: "——A location in the development at the southeast corner of Normandie Avenue and Redondo Beach Boulevard in said City of Gardena, to be a building 82'0"x150'0" in size and design as mutually agreed upon between Lessor and Lessee, *exclusive of parking which is hereinafter provided for.* Said demised premises shall consist of said real property, the building and improvements to be erected thereon as hereafter provided on a plot of ground with its boundary located 38'0" east of present Von's Market building, *and Lessee's rights to use the parking lot in common with other tenants of Lessor as hereinafter provided.*" (Emphasis added.) Paragraph (1) says that the premises to be occupied by the lessee "are to be a part of a planned development in which development Lessor will include approximately seven hundred (700) feet in developed and improved

frontage on Redondo Beach Boulevard, and on the south side thereof, extending in an easterly direction from the east line of Normandie Avenue.'' A map is attached and incorporated by reference. Paragraph (15) contains this: ''Lessor agrees to install and pave the parking lot as indicated on Exhibit 'A' attached hereto, and to make, at its own expense, all necessary improvements so as to provide *suitable and adequate parking for the entire development.* Said *parking lot shall be used by all of the tenants of Lessor in said planned development, as well as patrons and customers of said tenants.''* (Emphasis added.) Plainly, the document leaves plaintiffs possessed of an exclusive right to the building itself but limited to a common use of the parking facilities with all other tenants and their patrons and customers. The lease makes no specific mention of streets, sidewalks, etc., but, as the supplement of December 14, 1954, recites that the lease covers the building and ''in common with other tenants of Lessor, the parking area, private streets, sidewalks, alleyways and courts,'' it may be conceded for present purposes that that is a correct interpretation of the original document.

The picketing started on December 10, 1954. At that time plaintiffs had no exclusive right whatever in or to the locus of the picketing. Only the right to use it in common with others. No right to exclude anyone. The supplement of December 14th was made at the request of Mr. Nahas who told Mr. Hornung, according to the testimony of the latter, that ''the purpose was to protect my private property. . . . Against the pickets.''

This document, after reciting Nahas' existing right to common use, specifies that same ''shall be subject only to the rights of all other tenants of Lessor on said real property and their suppliers, and the employees and agents of such tenants and their suppliers, and patrons and customers of said tenants, to use said private streets, sidewalks, alleyways and courts for ingress and egress in connection with the regular business of such tenants, and to use said parking area for parking of vehicles in connection with the regular business of said tenants, and Lessee shall have the right to remove any other persons from said parking area and said private streets, sidewalks, alleyways and courts on said real property.

''2. Lessee shall have the exclusive right to control the use of the sidewalks extending along the front . . . and the rear of the building . . . except that Lessee shall keep said side-

walks free and clear of any obstructions and shall permit the use of said sidewalks by other tenants of Lessor on said real property, and patrons and customers of such tenants, for normal ingress and egress to and from the buildings occupied by said tenants, and Lessee shall have the right to remove all other persons therefrom.'' Manifestly it would be impossible to differentiate between customers of Nahas and Von, or to distinguish actual customers from prospective buyers, or potential patrons from mere lookers, or mere lookers from out and out trespassers. The quoted language of the supplement adds nothing to the lessee's right except an asserted power to remove ''any other persons,'' and that language, read in the light of the existing situation, meant only the strikers. The professed ''right to control'' falls in the same category. This document was nothing but an attempt on Hornung's part to transfer to Nahas a right to remove the pickets upon the theory that they were trespassers. Trespass against whom? Not Nahas, for he had no greater right in these walks than does one who fronts on a public sidewalk,——the right to enjoin picketing which is violent or threatening or abusive or en masse, or the like, but not orderly and peaceful picketing. Hornung is not a party to this action. The pickets were not interfering with him or his enjoyment of the premises. He had no right to cause their removal which he could transfer in gross. The problem presented by the attempted application of the Marsh and Marshall Field cases, *supra,* does not arise here because plaintiffs had no title to the walks or parking lot. They had only the same rights which one has whose store fronts on a public sidewalk or parking lot. ''The defendants have a right to use the public sidewalk in front of plaintiff's market for the purpose of spreading their propaganda. Plaintiff has a right to have his customers use the sidewalk for the purpose of entering and leaving his market. Neither right is exclusive; each may, fortunately, be exercised without a denial of the other, although each may interfere with the other. Defendants' use of the sidewalk may not be prohibited, but there may be a limitation placed upon the number using it and the manner of use, so that there is neither intimidation nor undue interference with its use by plaintiff's customers.'' (*Pezold* v. *Amalgamated etc. Workmen,* 54 Cal.App.2d 120, 126 [128 P.2d 611].)

■ Peaceful picketing, when pursued for the purpose of organizing a nonunion plant, is held in this state to be a

legitimate means to a lawful objective. (*C. S. Smith Met. Market Co.* v. *Lyons,* 16 Cal.2d 389, 401 [106 P.2d 414]; *Park & T. I. Corp.* v. *International etc. of Teamsters,* 27 Cal.2d 599, 604 [165 P.2d 891, 162 A.L.R. 1426]; *Pezold* v. *Amalgamated etc. Workmen, supra,* 54 Cal.App.2d 120, 122.)

The trial court found that there were certain abuses by some of the pickets, that they took pictures of customers and employees, made remarks to customers, such as "get that lady's license number," pushed Von's shopping carts in front of plaintiff's doorway in such manner as to block it, and used a sound truck. Such findings may justify a regulation of the manner and extent of picketing, but not an injunction prohibiting picketing entirely. (*Chrisman* v. *Culinary Workers' Local,* 46 Cal.App.2d 129, 133 [115 P.2d 553]; *Pezold* v. *Amalgamated etc. Workmen, supra,* 54 Cal.App.2d 120, 126; *Steiner* v. *Long Beach Local No. 128,* 19 Cal.2d 676, 684 [123 P.2d 20].)

The pickets were not trespassing upon plaintiffs' rights and the injunction against any picketing upon the Hornung property was too broad.

The judgment is reversed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied October 31, 1956, and the following opinion was then rendered:

THE COURT.—Respondents' petition for rehearing presents arguments built upon the assumption that Nahas was a tenant or a cotenant in possession of the parking lot, sidewalks, etc. They are misplaced. A mere right to use in common with others does not rise to that dignity.

The criterion of lease or license is presence or absence of a right of exclusive possession in the grantee, exclusive as to the landlord as well as others. When that is absent the agreement spells a license rather than a lease. Moreover, the fact that the license is not terminable at will or is coupled with a lessee's interest, does not destroy its character or convert it into a lease. 1 Tiffany on Real Property (3d ed.) section 79, page 117: "A tenancy involves an interest in the land passed to the tenant and a possession exclusive even of the landlord except as the lease permits his entry, and saving always the landlord's right to enter to demand rent or to make repairs. A mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive

possession of it being given, is but a license. . . . Such a person has not the possession of the land, this remaining in the licensor, and he has not, it seems, any interest in the land which he can assert as against a third person, that is, he has no rights in rem.

"The question whether an instrument is a lease, creating an estate in favor of another and the consequent relation of tenancy, or is merely a license, is one properly of the construction of the language used, as showing an intention to give possession vel non. That this is so has been quite often recognized."

*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 619 [184 P.2d 879]: "As stated in *Von Goerlitz* v. *Turner,* 65 Cal.App.2d 425, at page 429 [150 P.2d 278]: 'The test . . . "whether an agreement for the use of real estate is a license or a lease is whether *the contract gives exclusive possession of the premises against all the world, including the owner,* in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license, and this is a question of law arising out of the construction of the instrument." ' (Emphasis added.)"

This test has been accepted for many years in this state, as elsewhere. See *Shaw* v. *Caldwell,* 16 Cal.App. 1, 7 [115 P. 941]; *Covina Manor, Inc.* v. *Hatch,* 133 Cal.App.2d Supp. 790, 793 [284 P.2d 580]; 51 C.J.S. § 6, p. 513; 35 C.J. § 10, p. 954; *Tips* v. *United States,* (5 Cir.) 70 F.2d 525; *Cluett* v. *Sheppard,* 131 Ill. 636 [23 N.E. 589]; *Bowley* v. *Fuller,* 121 Me. 22 [115 A. 466, 468, 24 A.L.R. 964]; *Thayer* v. *Brainerd* (D.C.), 47 A.2d 787; *Mangum* v. *Milwood,* 207 Ga. 501 [62 S.E.2d 836, 837].

█ Because a licensee has no interest in the land he cannot maintain an action in trespass or ejectment. At the most, he may maintain an action to enjoin or to redress a violation of his right to exercise the license. (See annotation in 139 A.L.R. 1204.) The principle is thus stated in *Bell Tel. Co.* v. *Baltimore & O. R. Co.,* 155 Pa. Super. 286 [38 A.2d 732, 733]: "It is true that a license does not confer a right of possession sufficient to support an action in trespass quare clausum fregit (Tiffany, Real Property, §§ 814, 829), or an action of ejectment. *Union Petroleum Co.* v. *Bliven Petroleum Co.,* 72 Pa. 173. But a licensee may maintain an action of trespass in the nature of common-law case for any invasion or disturbance of the terms of the license whether by the licensor or by third parties."

Treated as an action to enjoin interference with plaintiffs' license to use the parking lot and sidewalks the relief which was granted in the present instance was too broad.

Respondents' petition for a hearing by the Supreme Court was denied November 28, 1956. Schauer, J., was of the opinion that the petition should be granted. McComb, J., did not participate therein.